ABBVIE INC. and Abbvie Biotechnology Limited, Plaintiffs–Counterclaim–Defendants,

v.

The MATHILDA AND TERENCE KENNEDY INSTITUTE OF RHEUMATOLOGY TRUST, Defendant–Counterclaim–Plaintiff.

No. 11 Civ. 2541(PAC).

United States District Court, S.D. New York.

June 20, 2013.

430

Dwyer, Cora Renae Holt, David P. Frazier, Jennifer A. Johnson, John T. Battaglia, Michael A. Morin, Robert F. Shaffer, Finnegan Henderson Farabow Garrett & Dunner LLP, Washington, DC, Steven P. O'Connor, Finnegan, Henderson, Farabow, Garrett & Dunner, L.L.P., Reston, VA, for Plaintiffs–Counterclaim–Defendants.

John Patrick White, Norman H. Zivin, Robert Thomas Maldonado, Cooper & Dunham LLP, Charles Joseph Boudreau, Gibson Dunn & Crutcher LLP, New York, NY, Azar Mouzari, Timothy P. Best, pro hac, vice, Wayne M. Barsky, Gibson, Dunn & Crutcher LLP, Los Angeles, CA, for Defendant–Counterclaim–Plaintiff.

Gerald Gordon Paul, Grant Alan Shehigian, Flemming Zulack Williamson Zauderer, LLP, New York, NY, Casey Lynn

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

PAUL A. CROTTY, District Judge:

## TABLE OF CONTENTS

FINDINGS OF FACT ................................................... 434

   I. THE PARTIES ............................................... 434

  II. II. RHEUMATOID ARTHRITIS AND ITS TREATMENT ................. 434
    A. Rheumatoid Arthritis ................................. 434
    B. Treatment of Rheumatoid Arthritis ................... 435
    C. Methotrexate ......................................... 435
    D. Treatment of Rheumatoid Arthritis with Combination Therapy ........... 436
    E. Anti–Tumor Necrosis Factor Alpha Antibodies ......... 437

 III. KENNEDY'S DISCOVERIES ...................................... 438
    A. Kennedy's Early Work with cA2 ....................... 438
    B. Kennedy's Open Label cA2 Study ...................... 440
    C. Kennedy's Anti–CD4 and Anti–TNFα Combination Study ........ 440
    D. Kennedy's Extension Study of cA2 in Humans .......... 441
    E. The Double–Blind Placebo–Controlled Trials of cA2 ... 442

  IV. OTHER RESEARCH AND PUBLICATIONS .......................... 442
    A. Schwieterman Discussion of Combination Treatment .... 442
    B. The Rankin CDP571 Trial ............................. 444
    C. Higgins Report on CDP571 and Methotrexate Combination Treatment..... 444

   V. THE T–14 STUDY ............................................ 445

  VI. KENNEDY'S PATENTS......................................... 448
    A. The '248 Application ................................ 448
    B. The '766 Patent .................................... 449

C. The Claims of the '766 Patent .......................................... 449
D. The Specification of the '766 Patent ................................... 450
E. Prosecution History of the '766 Patent ................................ 454
F. The '004 Application .................................................. 461
G. The '631 Application .................................................. 463
H. The '442 Patent and Specification ..................................... 470
I. The Claims of the '442 Patent ......................................... 470

VII. THE INSTANT DISPUTE ................................................... 472
A. Humira ............................................................... 472
B. Abbott's Sublicenses to Kennedy's Patents ............................ 472

CONCLUSIONS OF LAW ......................................................... 473

I. JURISDICTION .......................................................... 473

II. OBVIOUSNESS–TYPE DOUBLE PATENTING ..................................... 473
A. The Doctrine of Obviousness–Type Double Patenting .................... 473
B. Claim Construction ................................................... 474
C. Patentably Distinct Claims ........................................... 476

III. THE PERSON OF ORDINARY SKILL IN THE ART .............................. 477

IV. THE SIMILARITIES AND DIFFERENCES BETWEEN THE CLAIMS
OF THE '766 AND '442 PATENTS ........................................ 478
A. Construction of Claims 8 through 14 of the '766 Patent ............... 478
B. Construction of Claims 1 through 7, 13, 14, and 17 through 20 of the
'442 Patent ........................................................ 482
C. The Differences Between Claims 8 through 14 of the '766 Patent and
Claims 1 and 2 of the '442 Patent .................................. 484
D. The Differences Between Claims 8 through 14 of the '766 Patent and
Claims 3 through 7, and 13 of the '442 Patent ...................... 488
E. The Differences Between Claims 8 through 14 of the '766 Patent and
Claims 14 and 17 through 20 of the '442 Patent ..................... 491

CONCLUSION ................................................................. 493

Plaintiffs–Counterclaim–Defendants Abbvie Inc. and Abbvie Biotechnology Limited (collectively, "Abbott") bring this action against Defendant–Counterclaim–Plaintiff The Mathilda and Terence Kennedy Institute of Rheumatology Trust ("Kennedy") for a declaratory judgment that each of claims 1 through 7, 13, 14, and 17 through 20 of Kennedy's U.S. Patent No. 7,846,442 (the "'442 patent") is invalid for obviousness-type double patenting over claims 8 through 14 of U.S. Patent No. 6,270,766 (the "'766 patent"). Kennedy denies that these claims of the '442 patent are invalid for obviousness-type double patenting and counterclaims for a declaratory judgment that each of these claims of the '442 patent is not invalid.[1] The Court held a four-day bench trial in this action from September 18 through September 21, 2012.[2] After considering the parties' argu-

1. By an order dated August 10, 2012, the Court stayed Kennedy's other counterclaims, relating to Abbott's royalty obligations, pending determination of their arbitrability. (ECF No. 67.)

2. By an order dated September 11, 2012, the Court struck Kennedy's demand for a jury trial on the issue of the validity of the '442 patent. *Abbott Labs. v. The Mathilda and Terence Kennedy Inst. of Rheumatology Trust,* No. 11 Civ. 2541, 2012 WL 3965148. (ECF No. 101.)

ments, pretrial memoranda of law, and proposed findings of fact and conclusions of law, and evaluating the evidence produced at trial, including the documentary record and the testimony of the witnesses, the Court sets forth its Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a). For the following reasons, the Court concludes that each of claims 1 through 7, 13, 14, and 17 through 20 of the '442 patent is invalid for obviousness-type double patenting and that Kennedy has failed to prove its counterclaim that these claims of the '442 patent are not invalid.

## FINDINGS OF FACT

### I. THE PARTIES

1. As of the initiation of this action, Abbott Laboratories was an Illinois corporation with a principal place of business in Illinois and conducted business in this District.[3] (Compl. ¶ 2, ECF No. 1.) Pursuant to Federal Rule of Civil Procedure 25 and a Stipulation and Order Substituting Parties entered on January 11, 2013, Abbvie Inc. was substituted for Abbott Laboratories for all purposes with respect to Plaintiffs' claims and Defendant's counterclaims in this action. (ECF No. 119.) Abbvie Biotechnology Limited (formerly named Abbott Biotechnology Limited) is a corporation organized under the laws of Bermuda, with a place of business in Hamilton, Bermuda. Through intermediate organizations, Abbott Biotechnology Limited was formerly owned by Abbott Laboratories. (Compl.¶ 3.) The Court refers to the Plain-

tiffs–Counterclaim–Defendants collectively as "Abbott" throughout these Findings of Fact and Conclusions of Law. At all relevant times, Abbott was engaged in the development, sale, and distribution of a broad range of pharmaceuticals and other health-care products. (*Id.* ¶ 2.)

2. The Mathilda and Terence Kennedy Institute of Rheumatology Trust is organized and exists under the laws of the United Kingdom, with a place of business in London, England. Kennedy is the owner of certain United States patents, including the '766 patent and the '442 patent. (*Id.* ¶ 5; Am. Answer ¶ 5, ECF No. 40.)

### II. RHEUMATOID ARTHRITIS AND ITS TREATMENT

#### A. Rheumatoid Arthritis

3. Rheumatoid arthritis is an autoimmune disease characterized by inflammation of the joints. This inflammation, if left untreated, may result in joint pain and swelling, cartilage and bone destruction, deformity, incapacity, and potentially life-threatening complications. It may reduce life expectancy by up to a decade. At present, there is no cure for rheumatoid arthritis. Rheumatoid arthritis is estimated to affect approximately 0.6 to 1% of the U.S. population. (Tr.[4] at 136:23–137:13, 137:16–18, 138:18–19; Ex. 1408.1, Mark J. Borigini & Harold E. Paulus, "Rheumatoid Arthritis," in *Treatment of the Rheumatic Diseases* (Michael Weismann & Michael Weinblatt eds., 1995), at ABT-KEN00444893–94.[5])

---

3. Throughout these Findings of Fact and Conclusions of Law, the Court may adopt, without attribution, language suggested by one of the parties, but in all such instances the Court has made such findings or conclusions based upon its own review of the evidence and the law. To the extent that any finding of fact may be considered a conclusion of law, or vice versa, each should be considered as such.

4. The transcript of the trial proceedings may be found at docket entries 109, 111, 113, and 115.

5. Throughout these Findings of Fact and Conclusions of Law, the Court may cite to portions of the record. These citations are to representative materials in the record, and should not be considered exhaustive catalogs

4. Physicians identify rheumatoid arthritis and measure its severity based on the presence of a variety of signs and symptoms, including morning stiffness, fatigue, pain, and tenderness and swelling of the joints. (Tr. at 138:2–7, 140:17–22, 456:22–457:20.)

### B. Treatment of Rheumatoid Arthritis

5. Historically, the treatment of rheumatoid arthritis would begin with nonsteroidal anti-inflammatory drugs ("NSAIDs"), such as ibuprofen and aspirin, to reduce the pain and swelling caused by the disease. While treating symptoms, these medications do not stop or impede the progression of the disease or the damage it causes to the body. (Tr. at 138:20–23, 164:7–13, 164:20–165:1; Ex. 1408.1 at ABTKEN00444895–98.)

6. For patients for whom NSAID treatment did not work, rheumatologists would frequently prescribe cortisone or corticosteroids to reduce pain and swelling. These medications serve as anti-inflammatories, but can have negative side effects. (Tr. at 164:14–16, 165:5–14; Ex. 1408.1 at ABTKEN00444903–06.)

7. Beyond these treatments are disease-modifying antirheumatic drugs, or "DMARDS." DMARDs are more effective than NSAIDs in reducing the inflammation associated with rheumatoid arthritis, but can produce more serious side effects than the above treatments. Drugs classified as DMARDs include methotrexate, gold compounds, azathioprine, hydroxychloroquine, and sulfasalazine. (Tr. at 165:15–166:18; Ex. 1408.1 at ABTKEN00444898–03.)

### C. Methotrexate

8. Methotrexate is a drug that inhibits folic acid metabolism and was originally developed in the late 1940s for the treatment of childhood leukemia. Reports of methotrexate's positive effects in rheumatoid arthritis patients were published in the 1950s, but methotrexate was not adopted as a common treatment for this disease until much later. (Tr. at 166:23–167:14.)

9. By 1985, Dr. Michael Weinblatt and others were studying the use of methotrexate to treat rheumatoid arthritis. A 1985 Weinblatt study reported on the first randomized, placebo-controlled trials of short-term methotrexate treatment for this purpose and provided evidence of the short-term efficacy of methotrexate in the treatment of rheumatoid arthritis. (*Id.* at 169:2–170:12; Ex. FD, Michael Weinblatt et al., "Efficacy of Low–Dose Methotrexate in Rheumatoid Arthritis," *New Eng. J. Med.* 312:818 (1985).)

10. In 1988, the Food and Drug Administration ("FDA") approved methotrexate for the treatment of rheumatoid arthritis. (Tr. at 170:24–25.)

11. Subsequent long-term, controlled trials established that methotrexate remained effective for treating rheumatoid arthritis over many years of therapy with acceptable toxicity levels. (*Id.* at 171:12–172:11; Ex. 1497, Michael Weinblatt et al., "Methotrexate in Rheumatoid Arthritis," *Arth. & Rheum.* 37:1492 (1994).)

12. By 1994, studies and trials "ha[d] documented the efficacy of methotrexate and ha[d] indicated that its onset of action is more rapid than other DMARDs, and patients tend[ed] to remain on therapy

---

of all support for each respective finding or conclusion. In addition, certain portions of the record were produced with two different Bates numbers; where available, the Court will cite to the materials with the Bates prefix "ABTKEN," despite this Bates pagination not always proceeding in exact chronological order.

with methotrexate longer than they remain[ed] on other DMARDs because of better clinical responses and less toxicity." Additionally, "[b]ecause of its therapeutic benefit and toxicity profile, methotrexate [was] used before other second-line drugs by many rheumatologists." (Ex. 1403, Peter Lipsky, "Rheumatoid Arthritis," in *Harrison's Principles of Internal Medicine* (Kurt Isselbacher et al., eds., 13th ed.1994), at 1654–55; Tr. at 173:8–19; *see* Ex. 1475, Marc Feldmann & Ravinder N. Maini, "Anti–TNF Therapy, from Rationale to Standard of Care: What Lessons Has It Taught Us?," *J. Immunology* 185:791, 792 (2010) ("By the time the extensive, longer trials designed for drug registration were being planned (1994), the work of Michael Weinblatt and others had led to low-dose methotrexate (MTX) being widely used for the treatment of [rheumatoid arthritis] as the gold standard." (citing Ex. 1497)); *cf.* Ex. IB, Michael M. Ward, "Trends in the Use of Disease Modifying Antirheumatic Medications in Rheumatoid Arthritis, 1980–1995: Results from the National Ambulatory Medical Care Surveys," *J. Rheumatology* 26:546, 547–48 (1999) (stating that methotrexate was prescribed in 27% of rheumatoid arthritis patient visits from 1993 to 1995); Tr. at 592:2–16; *see also* Tr. at 354:2–360:22, 390:22–392:8 (noting that of patients in the Ward survey who were on DMARDs, almost half were receiving methotrexate, and percentage of rheumatoid arthritis patients on methotrexate was likely an underrepresentation because many patients were being treated by primary care physicians without expertise in rheumatology); Tr. at 719:17–722:18.)

13. By August 1, 1995, published studies had reported that methotrexate was at least no more toxic than other DMARDs and had fewer side effects than other DMARDs. (Tr. at 172:12–18; Ex. 1497; *see also* Tr. at 349:11–16, 350:15–351:16 (comparing methotrexate to other DMARDs).)

14. By this time, rheumatologists treated rheumatoid arthritis patients with doses of methotrexate ranging from 7.5 to 25 mg per week. While methotrexate may be administered either as a tablet or an injection, by the mid–1990s, methotrexate was more frequently administered in tablet form. Furthermore, by this time, it was only given on a weekly basis because more frequent administration was associated with greater toxicity risks. (Tr. at 167:23–168:13; Ex. FF, Michael Weinblatt, "Methotrexate," in *Textbook of Rheumatology* (4th ed., William N. Kelley et al., eds., 1993), at ABTKEN00444963.)

15. Although many patients responded favorably to methotrexate treatment for their rheumatoid arthritis, many still experienced symptoms of the disease despite methotrexate's benefits. The range of responses to methotrexate by itself ran from a significant reduction in painful and swollen joints and an improvement in function, to variable responses showing mediocre improvement, to no response at all. (Tr. at 174:7–14; *see id.* at 592:17–593:19.)

## D. Treatment of Rheumatoid Arthritis with Combination Therapy

16. By 1995, rheumatologists often would administer another drug in combination with the underlying methotrexate a patient was already receiving to patients who were not responding completely to methotrexate treatment alone. Although not universally accepted,[6] the treatment of rheumatoid arthritis with a combination of

---

6. By 1995, there had been a number of studies on combination therapy for the treatment of rheumatoid arthritis, some of which were positive, some of which were negative, in evaluating the efficacy and risks of the specific combinations being tested. (Tr. at 375:18–376:9; *e.g.,* Ex. 1411, David Felson et al., "The Efficacy and Toxicity of Combination

drugs (e.g., NSAIDs, corticosteroids, and DMARDs) was an established practice among rheumatologists by 1995. (Tr. at 174:25–180:2; *e.g.*, Ex. 1408.1 at ABT-KEN00444895, –00444909.)

17. By August 1, 1995, several studies had indicated that methotrexate could be more effective when used in combination with other DMARDs, as compared to methotrexate treatment alone, or methotrexate "monotherapy." (Tr. at 180:22–186:17; Ex. FA, Peter Tugwell et al., "Combination Therapy with Cyclosporine and Methotrexate in Severe Rheumatoid Arthritis," *New Eng. J. Med.* 333:137 (1995); Ex. DB, William Bensen et al., "Combination Therapy of Cyclosporine with Methotrexate and Gold in Rheumatoid Arthritis," *J. of Rheumatology* 21:2034 (1994); *see also* Ex. 1409, Rita Jain & Peter Lipsky, "Treatment of Rheumatoid Arthritis," *Med. Clinics of N. Am.* 81:57 (1997) (citing Exs. FA, DB); *cf.* Tr. at 364:24–367:9 (noting that of the many possible combinations of DMARDs being studied in the early 1990s, some were more successful than others).)

18. Physicians in the mid–1990s who were treating rheumatoid arthritis patients with methotrexate would often continue this treatment, even if it did not provide complete relief to patients, but add another treatment on top of the background methotrexate in order to prevent losing the benefits the methotrexate was providing and in an effort to prevent flares in patients' symptoms that could arise from stopping methotrexate. (Tr. at 180:3–21; *e.g.*, Ex. 1408.1 at ABTKEN00444909.)

### E. Anti–Tumor Necrosis Factor Alpha Antibodies

19. In the 1980s, researchers began to study the use of a class of therapeutics known as biologics for the treatment of rheumatoid arthritis, including the use of antibodies. Antibodies are produced naturally in the body, for example, in response to an infection, and regulate the body's immune response. (Tr. at 140:3–8, 144:8–13, 458:11–460:18.)

20. Beginning in the mid–1980s, Professors Ravinder Maini and Marc Feldmann, the named co-inventors of the '766 and '442 patents, began research on the role in rheumatoid arthritis of a group of proteins called cytokines. Their research led to the discovery of the role of a protein called Tumor Necrosis Factor Alpha, or "TNFα." (*Id.* at 451:10–454:8, 461:2–464:6.)

21. Professors Maini and Feldmann determined that TNFα is directly involved in the inflammatory effects of rheumatoid arthritis. In rheumatoid arthritis, TNFα present in the joints will bind to receptors on the surface of cells in the joint, which triggers an inflammatory immune response that leads to the joint damage and related signs and symptoms that are characteristic of the disease. (*Id.* at 143:1–24, 461:2–464:6.)

22. Through their research, Professors Maini and Feldmann discovered that blocking TNFα with a "monoclonal" antibody that specifically binds to it had positive therapeutic effects in rheumatoid arthritis patients. Anti–TNFα antibodies function by binding to TNFα, thereby preventing the TNFα from binding to the cell-surface receptors. By preventing the TNFα from binding to the cell-surface receptors, the immune-mediated processes associated with the disease are blocked. (*Id.* at 143:25–144:18, 145:7–146:17.)

Therapy in Rheumatoid Arthritis," *Arth. & Rheum.* 37:1487 (1994). *But see* Tr. at 371:4–374:5 (discussing potential flaws in studies).)

23. The human body makes antibodies in response to foreign invaders, but typically will not make antibodies against its own proteins, such as TNFα. Accordingly, such antibodies must be manufactured for administration to patients. (*Id.* at 144:19–145:6, 187:9–190:24.)

24. Antibodies that bind specifically to TNFα differ in composition and construction, and thus trigger varying responses in the human body. For example, a monoclonal antibody constructed completely from underlying mouse elements will be recognized as foreign in the human body, and the body will develop a response against it, known as a Human Anti–Mouse Antibody, or "HAMA," response. (*Id.* at 146:18–147:9.)

25. To overcome the problem of an immune reaction to the antibody used for treatment, genetic engineering techniques are used to replace much of the mouse protein in manufactured anti-TNFα antibodies with human protein, creating what is known as a "chimeric" antibody. In chimeric antibodies, the part of the antibody that binds to the TNFα originates from a mouse antibody while the portion of the antibody that does not bind to the target originates from a human antibody. (*Id.* at 147:10–148:2.)

26. Monoclonal antibody cA2, which binds specifically to human TNFα, is an example of a chimeric antibody. The part of the antibody that binds to the TNFα is from mouse monoclonal antibody A2, and the rest of the antibody is from a human antibody. (*Id.* at 147:13–148:2; Ex. 78, Michael J. Elliott, Ravinder N. Maini, Marc Feldmann et al., "Treatment of Rheumatoid Arthritis with Chimeric Monoclonal Antibodies to Tumor Necrosis Factor α," *Arth. & Rheum.* 36:1681 (1993), at KEN00349043.)

27. Although the human part of a chimeric antibody makes it appear less foreign to the body when administered to a human patient, the body may still recognize the chimeric antibody as foreign and develop an immune response to it. This is referred to as a Human Anti-Chimeric Antibody, or "HACA," response. (Tr. at 148:3–9; *see* Ex. 79, Michael J. Elliott, Ravinder N. Maini, Marc Feldmann et al., "Repeated Therapy with Monoclonal Antibody to Tumor Necrosis Factor α (cA2) in Patients with Rheumatoid Arthritis," *The Lancet* 344:1125 (1994), at KEN00267406.)

28. Antibodies that are comprised of fully human constituents are designed to have a low potential for detection and immune responses from the body, but some patients still develop a Human Anti–Human Antibody, or "HAHA," response to such antibodies. Humira®, which is marketed by Abbott for the treatment a number of conditions, is an example of a fully human antibody that specifically binds to TNFα. (Tr. at 148:10–25.)

## III. KENNEDY'S DISCOVERIES

### A. Kennedy's Early Work with cA2

29. Professor Maini became affiliated with Kennedy in 1979 and became its scientific director in 1990. Professors Maini and Feldmann began collaborating in 1985 on research into rheumatoid arthritis. (Tr. at 447:1–451:19; Ex. HA, Professor Sir Ravinder Maini Curriculum Vitae.)

30. In the mid–1980s, Professors Maini and Feldmann researched cytokines in the joints of patients with rheumatoid arthritis and, by the late 1980s, they developed the hypothesis that blocking TNFα would yield therapeutic benefits in the treatment of rheumatoid arthritis. Professors Maini and Feldmann performed experiments to test their hypothesis and, in 1990, began a trial of a hamster monoclonal anti-TNFα antibody in mice with an induced rheuma-

toid arthritis-like illness. (Tr. at 458:11–468:6.)

31. The results of this study, ultimately published in 1992, demonstrated a clear amelioration of the inflammation and bone and cartilage damage in the mice that were treated with the anti-TNFα antibody. (*Id.* at 466:14–16; Ex. JQ, Richard O. Williams, Marc Feldmann & Ravinder N. Maini, "Anti–Tumor Necrosis Factor Ameliorates Joint Disease in Murine Collagen–Induced Arthritis," *Proc. Nat'l. Acad. Sci.* 89:9784 (1992).)

32. Professors Maini and Feldmann then pursued similar experiments in humans suffering from rheumatoid arthritis, by working with companies that were making monoclonal anti-TNFα antibodies for use in human trials for other diseases. By 1991, Professors Maini and Feldmann had discussions with the company Centocor regarding the use of Centocor's anti-TNFα antibody, cA2. (Tr. at 473:10–15, 474:3–476:9.)

33. Centocor had previously developed cA2 to treat a condition known as septic shock, but Centocor's clinical trials for this use in humans were not successful. Centocor agreed to allow Professors Maini and Feldmann to use cA2 in their rheumatoid arthritis trials. (*Id.* at 477:3–478:1.)

34. Centocor and Kennedy entered into a research and licensing agreement, dated January 1, 1992, under which Centocor provided funding and material support for Professors Maini and Feldmann's research in return for licensing rights to any intellectual property that would result from this research.[7] (Ex. AX, Research and Licensing Agreement.)

35. Professors Maini and Feldmann thereafter performed a study of cA2 in human rheumatoid arthritis patients in an "open label" format, in which both the physicians and patients knew that the patients were being administered cA2. This clinical investigation took place from April to June 1992, and the results were announced in September 1992 at a scientific conference organized by Professor Feldmann. These results were ultimately published in 1993. (Tr. at 478:9–481:22; Ex. 78; Ex. 1588, Dep. of Prof. Marc Feldmann at 28:14–19 (Mar. 15, 2012).)

36. This open label study showed positive results, with patients describing significant physical improvement and Professors Maini and Feldmann observing improvements in joint swelling and tenderness. (Tr. at 478:9–481:22; Ex. 78.)

37. At the same time Professors Maini and Feldmann were performing the open label study, they were also following up on their first trial of hamster monoclonal anti-TNFα antibody in mice. The first study had shown that over time the mice developed an immune response to the hamster antibody similar to the HAMA response (*see supra* ¶ 24), which resulted in decreased efficacy of the anti-TNFα antibody. (Tr. at 468:9–19.)

38. Professors Maini and Feldmann devised a second mouse trial to test whether the use of another antibody ("anti-CD4") in combination with an anti-TNFα antibody would yield longer-term benefits by suppressing the HAMA-like response in mice. This second study, ultimately published in 1994, showed that the combination of the anti-TNFα antibody and anti-CD4 antibody yielded superior benefits over the use of the anti-TNFα antibody alone. (*Id.* at 468:20–473:5; Ex. JR, Richard O. Williams, Lesley J. Mason, Marc Feld-

---

7. Pursuant to this agreement, Centocor also paid for the prosecution of any patent that derived from Kennedy's research. However, Kennedy retained the final say in the patent prosecution process. (*See* Tr. at 545:25–546:8.)

**440**

mann & Ravinder N. Maini, "Synergy between Anti–CD4 and Anti–Tumor Necrosis Factor in the Amelioration of Established Collagen–Induced Arthritis," *Proc. Nat'l. Acad. Sci.* 91:2762 (1994).)

### B. Kennedy's Open Label cA2 Study

39. In December 1993, Professors Maini and Feldmann published the final results of their initial open label clinical study involving the administration of Centocor's anti-TNFα chimeric antibody, cA2, for the treatment of rheumatoid arthritis. (Ex. 78; Tr. at 187:9–19, 481:16–22.)

40. The objective of the open label study was to evaluate the safety and efficacy of a chimeric anti-TNFα antibody in the treatment of patients with rheumatoid arthritis. (Ex. 78 at KEN00349041.)

41. The patients who participated in the open label trial were, by design, those who had failed the standard treatments of the time, including having failed a median of four different DMARDs before enrolling in the trial, with a significant percentage having received methotrexate in the past. Of the twenty patients enrolled in the trial, all had active rheumatoid arthritis, despite prior treatment with multiple DMARDs; fourteen of the twenty patients had not completely responded to prior treatment with methotrexate. (*Id.* at KEN00349042–43; Tr. at 189:3–15, 483:2–25.)

42. The patients in the open label trial were administered cA2 by itself, after a period of at least one month in which they ceased receiving their previous DMARD treatment, including methotrexate. Such a break in treatments is known as a "washout" period. (Ex. 78 at KEN00349043; Tr. at 189:16–21, 482:3–483:1.)

43. The patients received administrations of cA2 as infusions over staggered weeks, either in doses of 10 mg/kg of body weight over two weeks or 5 mg/kg over four weeks, but in all instances totaling 20 mg/kg. (Ex. 78 at KEN00349043; Tr. at 478:23–479:22.)

44. The open label cA2 study concluded:

Treatment with anti-TNFα was safe and well tolerated and resulted in significant clinical and laboratory improvements. These preliminary results support the hypothesis that TNFα is an important regulator in [rheumatoid arthritis], and suggest that it may be a useful new therapeutic target in this disease. (Ex. 78 at KEN00349041; Tr. at 484:1–12.)

45. Due to the "open label" design of the study, however, Professors Maini and Feldmann could not confirm that the clinical efficacy observed was due to cA2, and not to a placebo effect in the subject patients. (Tr. at 480:5–21; *see id.* at 188:19–189:2.)

### C. Kennedy's Anti–CD4 and Anti–TNFα Combination Study

46. In March 1994, Professors Maini and Feldmann published the final results of their study to test whether the combination of anti-CD4 with an anti-TNFα antibody would lead to longer-term benefits by suppressing the HAMA-like response in mice. (Ex. JR; Tr. 471:24–472:3.)

47. This study concluded:

[O]ptimal anti-TNF combined with anti-CD4 caused significantly greater reductions in paw swelling and joint erosion than those achieved by optimal anti-TNF alone. Coadministration of anti-CD4 was also effective in preventing an antibody response to the hamster anti-TNF antibody, which may have implications for long-term therapy in human disease. Thus anti-CD4 acts synergistically with anti-TNF in ameliorating established collagen-induced arthritis and this combined therapeutic approach may

provide effective long-term control of rheumatoid arthritis. (Ex. JR at KEN00356475; Tr. at 472:4–473:5.)

### D. Kennedy's Extension Study of cA2 in Humans

48. Although the open label study of the use of cA2 in rheumatoid arthritis patients showed successful results for a short time period (*see supra* ¶¶ 39–44), continued evaluation showed that after a predictable period of time, the open label patients' rheumatoid arthritis returned. Professors Maini and Feldmann thus continued to treat a subset of the patients in the open label study for a prolonged period of time to determine the long-term effects of cA2 treatment. (Tr. at 484:15–485:13; *see id.* at 196:22–197:10; Ex. 79.)

49. In this subsequent "extension" study, patients received multiple doses of cA2 as infusions in response to flares of rheumatoid arthritis. The first dose of cA2 the extension study patients received was 20 mg/kg, while the second dose was 10 mg/kg. (Ex. 79; Tr. at 485:15–20, 489:4–22; *see* Tr. at 197:6–14.)

50. This study demonstrated that when rheumatoid arthritis reappeared in patients after the initial dose of cA2, subsequent doses of cA2 produced the same level of reduction in signs and symptoms of the disease, but with each successive subsequent dose, the duration of the benefits produced shortened significantly. (Ex. 79; Tr. at 485:21–489:22; *see* 198:18–199:5.)

51. The extension study paper, published in October 1994, stated that the "success in demonstrating repeated responses in the same individuals suggests that regular treatment with cA2 may achieve long-term disease suppression," indicating that the antibody was an effective treatment approach for chronic rheumatoid arthritis. (Ex. 79 at KEN00267407; Tr. at 198:1–7.)

52. Professors Maini and Feldmann also observed from the extension study that the shortened duration of response to each successive treatment of cA2 appeared to be due to the patients' developing a HACA response to the chimeric anti-TNFα antibody, cA2. (Ex. 79 at KEN00267407; Tr. 486:4–12; *see* Tr. at 198:18–199:5.)

53. Professors Maini and Feldmann suggested that "[s]everal strategies could be adopted to prevent the development of antiglobulin responses to cA2, including combination therapy with traditional immunosuppressive drugs or the co-administration of specific, T-cell-directed monoclonal antibodies with the aim of inducing tolerance." The purpose of these strategies was to reduce the human body's immune (HACA) response to the anti-TNFα antibody in order to produce a longer duration of the benefits of the cA2 administrations. (Ex. 79 at KEN00267407; Tr. at 199:6–24, 491:4–494:4.)

54. As of October 1994, when the extension study was published, methotrexate was a drug known to have immunosuppressive properties.[8] (Tr. at 199:25–201:10; Ex. 1403 at 1654; *see also* Tr. at 392:9–393:11; *cf.* Tr. at 501:24–504:20, 557:10–561:21 (discussing immunosuppressive properties of methotrexate when administered in high doses).)

55. The extension study also cited Professors Maini and Feldmann's combination study of both anti-TNF and anti-CD4 antibodies in mice, and noted these two antibodies "were synergistic in the control of murine collagen-induced arthritis, and antiglobulin responses to the TNF blocking antibody were reduced. The application of such combination immunotherapy deserves

---

**8.** A treatment can be both an immunosuppressive and a DMARD. (Tr. at 331:15–17.)

further investigation in man." (Ex. 79 at KEN00267407 (citing Ex. JR).)

### E. The Double–Blind Placebo–Controlled Trials of cA2

56. Following the success of the open label cA2 study, Professors Maini and Feldmann sought to confirm its results in a double-blind, placebo-controlled trial undertaken in several separate research centers in Europe. (Tr. at 494:6–495:6; see id. at 190:9–16.)

57. As in the open label study, the double-blind study involved patients with rheumatoid arthritis who "had a history of failed treatment with at least one disease-modifying anti-rheumatic drug." Also, the patients were withdrawn from their DMARD therapies for at least four weeks before entering into the double-blind trial. (Ex. 80, Michael J. Elliott, Ravinder N. Maini, Marc Feldmann et al., "Randomised Double–Blind Comparison of Chimeric Monoclonal Antibody to Tumour Necrosis Factor α (cA2) Versus Placebo in Rheumatoid Arthritis," The Lancet 344:1105 (1994), at KEN00355972–73; Tr. at 495:7–496:9; see Tr. at 190:17–24.)

58. Participants in the double-blind study received either an infusion of placebo or cA2 antibody and were monitored for four weeks. The cA2 was administered in doses of either 1 mg/kg or 10 mg/kg. (Ex. 80 at KEN00355973; Tr. at 496:13–22.)

59. The results of the double-blind study, published in October 1994, "confirm[ed] the findings of [Professors Maini and Feldmann's] open-label trial of cA2 in a similar patient group." (Ex. 80 at KEN00355976; see Tr. at 496:17–18.)

60. As in the case of the open label study, Professors Maini and Feldmann reported that "cA2 infusions were well tolerated and few adverse events were recorded in any group." The duration of the benefits produced continued longer with the higher (10 mg/kg) dose of cA2. (Ex. 80 at KEN00355976.)

61. The double-blind study concluded that the "results show that blockade of TNFα with cA2 was highly effective and safe in the short term treatment of rheumatoid arthritis." Professors Maini and Feldmann also cited their long-term extension study results and stated that "[w]ith our accompanying results, which demonstrate repeated beneficial responses to cycles of cA2, the data define a major new direction for rational therapy in this disease." (Id. at KEN00355976 (citing Ex. 79); see id. at KEN00355972; Tr. at 498:7–17.)

## IV. OTHER RESEARCH AND PUBLICATIONS

### A. Schwieterman Discussion of Combination Treatment

62. At a conference in March 1995, leading rheumatologists and FDA representatives discussed the use of biologic agents, including anti-TNFα antibodies, in the treatment of rheumatoid arthritis. (Tr. at 206:6–207:13; Ex. 73, William Schwieterman, "Immunosuppression in Combination with Monoclonal Antibodies," in Proceedings: Early Decisions in DMARD Development IV: Biologic Agents in Autoimmune Diseases (1996).)

63. By March 1995, Professors Maini and Feldmann had published three studies on the safety and efficacy of using anti-TNFα antibodies to treat rheumatoid arthritis. (See Exs. 78, 79, 80; supra ¶¶ 39, 51, 57.)

64. Professors Maini and Feldmann had also observed the synergistic benefits in the treatment of rheumatoid arthritis with anti-CD4 in combination with an anti-TNFα antibody, specifically the prevention

of an immune response to the anti-TNFα antibody. (Ex. JR; *see supra* ¶¶ 46, 47.)

65. In addition, Professors Maini and Feldmann had suggested research into the suppression of the human immune response to anti-TNFα antibodies, including "combination therapy [of cA2] with traditional immunosuppressive drugs." (Ex. 79 at KEN00267407; *see supra* ¶ 53.)

66. At the March 1995 conference, Dr. William Schwieterman, from the FDA, discussed the use of biologics for the treatment of rheumatoid arthritis, and particularly the safety of combination treatments involving immunosuppressives or DMARDs and biologics such as anti-TNFα antibodies. Dr. Schwieterman stated that in such research, patient safety was the paramount concern, and cautioned that the safety of the biologic must be established first, in the "Phase I" of any study. As such, he noted that the use of "immunosuppressive agents and DMARDs should usually be minimized, if not eliminated, in Phase I studies." Dr. Schwieterman acknowledged, however, that "[t]here are cases to be made for initially studying patients who are also treated with methotrexate background therapy." (Ex. 73 at ABTKEN00445120.)

67. In response to Dr. Schwieterman, Dr. Weinblatt raised "the issue of withdrawing people from methotrexate" before enrolling in studies of biologic therapies, stating that "[t]here are some real ethical issues ... in asking patients to get worse in order to enroll in studies." Instead, Dr. Weinblatt suggested that "[b]ecause methotrexate is such a dominant drug in the U.S., ... a likely study population will be patients that are incomplete responders on methotrexate. That is the population, from both a practical and commercial standpoint, that we would be interested in looking at: not patients withdrawn from methotrexate, but rather, incomplete responders on it." (*Id.* at ABTKEN00445122.)

68. Dr. Weinblatt's question addressed the situation in which rheumatoid arthritis patients who were receiving methotrexate, even if they did not respond completely to this treatment, would experience flares in their disease activity when taken off of methotrexate, including when enrolling in trials of other therapies. (Tr. at 208:1–209:6.)

69. Dr. Weinblatt's suggestion was that after a biologic was shown to be safe, it should then be tested in patients who were receiving, and would continue with, methotrexate treatment. As of March 1995, companies did not follow this practice in testing their treatments. (*Id.* at 210:2–16.)

70. Indeed, at the time of this convention, the FDA required that patients be withdrawn from methotrexate treatment before trials with biologics could begin. Dr. Weinblatt sought to allow clinical studies with patients who remained on methotrexate treatment. (*Id.* at 312:25–317:17.)

71. Dr. Schwieterman agreed with Dr. Weinblatt's suggestion and responded that if the studies of the biologic agent alone (without methotrexate) were shown to be safe, then it would be "perfectly appropriate to go into a methotrexate treated population." (Ex. 73 at ABTKEN00445123; *see* Tr. at 210:17–211:12.)

72. In discussing the structure of such trials, Dr. Weinblatt asked Dr. Schwieterman whether, after the "Phase I" to determine the safety of the biologic alone, it would make sense "instead of going into a Phase II background on methotrexate, you would repeat those [Phase I] studies in [rheumatoid arthritis] patients on methotrexate." (Ex. 73 at ABTKEN00445123; *see* Tr. at 211:21–25.)

73. Dr. Schwieterman responded that the FDA had "recommended the design

that you mentioned to several sponsors, and it has become standard to go first alone [with the biologic] and then go with methotrexate." (Ex. 73 at ABT-KEN00445123; *see* Tr. at 212:1–213:1.)

## B. The Rankin CDP571 Trial

74. While Professors Maini and Feldmann were advancing their research with cA2, other researchers and institutions were also studying and experimenting with other anti-TNFα antibodies. (Tr. at 192:20–193:2.)

75. In April 1995, Professor E.C.C. Rankin and colleagues published the results of a placebo-controlled trial of a monoclonal anti-TNFα antibody known as CDP571 in patients with rheumatoid arthritis. (Ex. 1412, E.C.C. Rankin et al., "The Therapeutic Effects of an Engineered Human Anti–Tumour Necrosis Factor Alpha Antibody (CDP571) in Rheumatoid Arthritis," *British J. of Rheumatology* 34:334 (1995); Tr. at 193:6–16.)

76. The CDP571 was administered intravenously as an infusion in doses of 0.1, 1.0, or 10 mg/kg of body weight to patients suffering from rheumatoid arthritis. The CDP571 study also included a washout period where patients stopped their prior DMARD treatment before receiving any antibody. (Ex. 1412; Tr. at 193:18–194:2.)

77. The study concluded that "CDP571, an engineered human anti-TNF antibody, is well tolerated, and, after a single dose of 10 mg/kg, provides improvements in symptoms, signs, and serological markers of disease activity in patients with active [rheumatoid arthritis]." (Ex. 1412 at ABTKEN00445106, Tr. 193:12–17.)

78. Similar to the extension work that Professors Maini and Feldmann continued after the positive results of the open label study of cA2 (*see supra* ¶ 48), the authors of the CDP571 study continued their research after the initial results with a second infusion of the antibody in order to determine the safety and longer-term benefits of CDP571. The authors concluded that "[t]he continuation phase, although open, confirmed both the safety and beneficial effects of CDP571 in active [rheumatoid arthritis]." (Ex. 1412 at ABT-KEN00445106.)

## C. Higgins Report on CDP571 and Methotrexate Combination Treatment

79. In July 1995, a medical news publication, reporting on recent developments in rheumatology research, stated that researchers were focusing on the method of treatment Drs. Weinblatt and Schwieterman discussed at the March 1995 conference—where patients receiving methotrexate, but still experiencing signs and symptoms of rheumatoid arthritis, would receive treatment of an anti-TNFα antibody on top of their background methotrexate. (Ex. 1575, Gill Higgins, "Cytokine Antagonism: Still A Main Attraction in Rheumatology R & D," *Inpharma* (Jul. 8, 1995); *see* Tr. at 215:3–24.)

80. This article stated that "the greatest potential [for developing cytokine antagonists as therapy for autoimmune diseases] appears to lie with antibodies to tumour necrosis factor-α (TNF-α) and the use of soluble receptors for TNF-α and interleukin–1 (IL–1)." (Ex. 1575 at 9.)

81. The article covered the human cA2 studies published by Professors Maini and Feldmann and the positive results shown in each. (*Id.* at 9–10 (citing Exs. 79, 80); *see* Tr. at 213:24–214:13.)

82. In addressing future studies being planned by researchers in the field, the article stated:

> The development of CDP–571 will be pursued by Bayer following its recent acquisition of the drug from Celltech.

One of the key studies to be conducted will look at the possibility of combining CDP–571 with methotrexate in patients with rheumatoid arthritis who do not respond to methotrexate alone. (Ex. 1575 at 10.)

## V. THE T–14 STUDY

83. In September 1994, Professors Maini and Feldmann began a study of rheumatoid arthritis patients where anti-TNFα antibody was given, over a period of time, either alone or in combination with methotrexate, to patients who had not responded completely to previous methotrexate treatment alone. This was known as the "T–14 study." The results of the study were ultimately published in September 1998. (Ex. 1025, Ravinder N. Maini et al., "Therapeutic Efficacy of Multiple Intravenous Infusions of Anti–Tumor Necrosis Factor α Monoclonal Antibody Combined with Low–Dose Weekly Methotrexate in Rheumatoid Arthritis," *Arth. & Rheum.* 41(9):1552 (1998); Tr. at 508:10–509:8, 564:14–18; *see* Tr. at 231:6–17; Ex. 1051, Martin Page, "Chimeric (Human, Murine) Monoclonal Antibody (cA2) to Tumor Necrosis Factor, Methotrexate" (May 29, 1996); Ex. 1571, R.N. Maini, "Phase II Multicenter Study of Chimeric Anti–TNF Monoclonal Antibody (cA2) in Adjunct to Methotrexate Treatment in Patients With Rheumatoid Arthritis" (Sept. 16, 1999).)

84. The T–14 study was designed to evaluate the efficacy, safety, and immunogenicity (the human body's rejection of the mouse component of the chimeric antibody, or HACA response (*see supra* ¶ 27)) of multiple doses of the anti-TNFα antibody cA2 (at 1, 3, or 10 mg per dose) administered as infusions to patients at weeks 0, 2, 6, 10, and 14 of a 26–week trial, either with or without weekly methotrexate doses (at 7.5 mg/kg) as well. (Ex. 1025 at 1553; Tr. at 231:6–232:3; *see* Tr. 492:18–493:3, 527:16–19.)

85. The patients enrolled in the T–14 trial had each been treated with weekly methotrexate for at least six months prior to the trial.[9] Before receiving any cA2 in the T–14 trial, the patients were "stabilized" on a fixed weekly dose of 7.5 mg/kg of methotrexate for four weeks. (Ex. 1025 at 1553; Tr. at 519:6–16; *see* Tr. at 291:8–292:2.)

86. The T–14 study was the first successful study of an anti-TNFα antibody that did not include a washout period of prior DMARD therapies. (Tr. at 311:18–312:24.)

87. The patients in the T–14 study were organized into three overarching groups—(1) patients who received methotrexate as a tablet and infusions of a placebo (instead of cA2) throughout the trial (the "control" group), (2) patients who received methotrexate as a tablet and infusions of cA2 throughout the trial, and (3) patients who received a placebo as a tablet (instead of methotrexate) and infusions of cA2 throughout the trial. Among these three overarching groups, the patients in the T–14 study were further organized into seven separate "arms." Within the control group, there was only one "arm," in which patients received weekly doses of 7.5 mg/kg of methotrexate as a tablet, while receiving infusions of placebo at the designated weeks of the trial. Within the group who received methotrexate and cA2 throughout the trial, there were three

---

9. As Professors Maini and Feldmann described in the published article on the T–14 study, the patients enrolled in the study "had taken [methotrexate] once a week at a dosage of 7.5–15 mg/week.... This relatively low pretreatment dosage ... was in the range used in clinical practice in Europe when the protocol was designed in 1994." (Ex. 1025 at 1553; *see supra* ¶ 14.)

**446**

arms, in which the patients received weekly doses of 7.5 mg/kg of methotrexate as a tablet, while receiving infusions of cA2 at the designated weeks in doses of either 1, 3, or 10 mg/kg, respectively. Within the group who received placebo and cA2 throughout the trial, there were also three arms, in which the patients received weekly placebo tablets while receiving infusions of cA2 at the designated weeks in doses of either 1, 3, or 10 mg/kg, respectively. The designated weeks of the trial during which the infusions of either cA2 or placebo were administered were weeks 0, 2, 6, 10, and 14. (Ex. 1025 at 1553; Tr. at 514:6–515:15.)

88. The published article on the T–14 study visualized the administration groups and arms in Table 1, with the three arms for patients who received methotrexate and each respective dose of cA2 throughout the trial being indicated as "MTX +" and the three arms for patients who received placebo and each respective dose of cA2 throughout the trial being indicated as "MTX-":

Table 1. Baseline patient characteristics and clinical and laboratory indices of disease activity*

| | Placebo plus MTX (n = 14) | cA2 | | | | | |
| | | 1 mg/kg | | 3 mg/kg | | 10 mg/kg | |
| | | MTX+ (n = 14) | MTX– (n = 15) | MTX+ (n = 15) | MTX– (n = 14) | MTX+ (n = 14) | MTX– (n = 15) |

(Ex. 1025 at 1555.)

89. The T–14 study results showed that patients in the group who continued to receive the weekly methotrexate while also receiving infusions of cA2 (for each cA2 dose) showed longer lasting results than those patients in the group who only received cA2 (and not methotrexate) throughout the trial. (*Id.* at 1552; Tr. at 525:18–527:5.)

90. The T–14 study results also showed that for the patients who continued to receive the weekly methotrexate during the trial, in addition to the duration of response, the magnitude of the body's response to the cA2 treatment was increased as well. (Tr. at 527:6–15.)

91. Professors Maini and Feldmann further confirmed their hypothesis from their earlier studies with mice that the immunogenicity of cA2 (the body's HACA response) was dramatically reduced by administration in combination with methotrexate. (*Id.* at 527:16–19.)

92. Specifically, Professors Maini and Feldmann noted that "coadministration of cA2 at 1 mg/kg with MTX [methotrexate] appeared to be synergistic, prolonging the duration" of the body's positive response to cA2, and that this increased durational response was due to methotrexate reducing the body's immune response to the chimeric antibody. (Ex. 1025 at 1552; *see id.* at 1561 (observing that "[t]he difference in pharmacokinetics of cA2 at 1 mg/kg very likely reflects the immunogenicity of cA2, since the incidence of HACA was 53% in the group not receiving MTX and only 15% when MTX was administered concomitantly. Based on these data, we suggest that the apparent synergy of the action of cA2 plus MTX is based in part on the decreased immunogenicity of cA2 given simultaneously with MTX"); Tr. at 283:22–284:25.)

93. Professors Maini and Feldmann summarized the conclusions of the T–14 study in a 1997 abstract titled "Low Dose Methotrexate Suppresses Antiglobulin Responses and Potentiates Efficacy of a Chimeric Monoclonal Anti–TNF Antibody Given Repeatedly in Rheumatoid Arthritis," *Arth. & Rheum.* 40(9 Suppl.):A571 (1997). (Ex. 1023; *see* Tr. at 576:21–577:6, 579:2–20.) This abstract stated:

In this multicentre, placebo-controlled trial of cA2 (Centocor Inc.), given as a monotherapy or combined with MTX, we sought to establish whether the regimen we used a) induced immunological tolerance to cA2; and b) was effective therapy during and beyond the period of cA2 administration.

[...]

The frequency of human anti–cA2–antibody (HACA) responses in patients receiving cA2 as monotherapy at 1, 3 and 10 mg/kg was 53%, 21 % and 7% respectively, and in cA2 plus MTX treated groups was 17%, 7% and 0% respectively. (Ex. 1023.[10])

94.   In the published article on the T–14 study in the peer-reviewed journal *Arthritis and Rheumatism*, Professors Maini and Feldmann described the treatment given to the overarching group of patients who had been receiving methotrexate prior to the trial, had been stabilized on a weekly methotrexate dose of 7.5 mg/kg for four weeks before receiving infusions of cA2, had stopped receiving methotrexate at the beginning of the infusion treatment, and had received infusions of cA2 at weeks 0, 2, 6, 10, and 14 of the trial as cA2 "monotherapy" or "without methotrexate." (Ex. 1025 at 1553, 1560; Tr. at 232:4–18; see Tr. at 564:14–576:8.)

95.   In the same. article, Professors Maini and Feldmann described the treatment given to the overarching group of patients who had been receiving methotrexate prior to the trial, had been stabilized on a weekly methotrexate dose of 7.5 mg/kg for four weeks before receiving infusions of cA2, had continued receiving the same weekly methotrexate throughout the infusion treatment, and had received infusions of cA2 at weeks 0, 2, 6, 10, and 14 of the trial as "combination therapy when

coadministered" or "combination therapy." (Ex. 1025 at 1553, 1560; Tr. at 232:19–233:3;  see Tr. at 564:14–576:8.)

96.   Professors Maini and Feldmann distinguished in this published study between these two overarching sets of patient groups as receiving either cA2 "alone or in combination with" methotrexate. (Ex. 1025 at 1552; see id. (distinguishing between patients receiving cA2 "with or without MTX [methotrexate]"); id. (noting that "[w]hen cA2 at 1 mg/kg was given with low-dose MTX, synergy was observed"); see also Tr. at 564:14–576:8.)

97.   Similarly, in the abstract of the T–14 study, Professors Maini and Feldmann identified these two sets of patient groups as having received either cA2 "monotherapy" or "combined with [methotrexate]." (Ex. 1023; Tr. at 578:20–579:20.)

98.   In a January 1997 letter to the *New England Journal of Medicine*, enclosing a manuscript on the T–14 study, Professor Maini summarized the manuscript by stating that "[i]t describes the control of symptoms of rheumatoid arthritis by repeated intravenous monoclonal anti-TNFα antibody alone, and in combination with low-dose weekly methotrexate, in a randomized placebo-controlled trial." (Ex. 1052, Letter from R.N. Maini to Jerome P. Kassierer, Editor–in–Chief, *New Eng. J. Med.* (Jan. 29, 1997), at KEN00042592; Tr. at 582:6–21.)

99.   In an October 1997 letter to the journal that published the T–14 study, Professor Maini submitted a manuscript and described the protocols of the T–14 study: "Treatment was with cA2 alone or in combination with methotrexate while the placebo group continued to receive methotrexate." (Ex. 1603, Letter from R.N.

---

**10.**   The conclusion ·that methotrexate suppresses the anti-cA2 response was also described by Professors Maini and Feldmann in a recent publication. (Ex. 1475 at 792.)

Maini to William P. Arend, Editor, *Arth. & Rheum.* (Oct. 28, 1997), at KEN00362659; Tr. at 579:21–581:13; *see also* Ex. 1602, R.N. Maini, Abstract, "Interference with the Cytokine Cascade via Monoclonal Anti–TNFα Antibody," EULAR (1997) ("In this presentation, the results of a multi-centre European trial in which infusions of anti-TNF antibody are given at monthly intervals either as monotherapy, or in combination with low dose methotrexate (MTX) once a week, over a period of 14 weeks, is presented."); Tr. at 581:15–582:4.)

100. In a January 2003 email from Professor Feldmann to Professor Maini, concerning their joint research on rheumatoid arthritis and treatment with anti-TNFα antibodies for submission for the Lasker Prize, Professor Feldmann described the results of the T–14 study as showing that "the efficacy of anti-TNF antibody is shown to be more durable when coadministered with methotrexate." (Ex. 1036, E-mail from Marc Feldmann to Ravinder Maini (Jan. 13, 2003), at KEN00219466, Tr. 535:8–537:21; *see also* Ex. GX (inscription on Albert Lasker Clinical Research Award "for discovery of anti-TNF therapy as an effective treatment for rheumatoid arthritis and other autoimmune diseases"); Tr. at 537:22–539:2.)

101. In all these materials, Professors Maini and Feldmann used the same language as that of the T–14 study and distinguished between cA2 "alone" and "in combination with" methotrexate. (Tr. at 582:22–24.)

102. Excluding the materials submitted in support of the '442 and '766 patents, Professors Maini and Feldmann never referred to the group of patients who had been receiving methotrexate prior to the trial, had been stabilized on a weekly methotrexate dose of 7.5 mg/kg for four weeks before receiving infusions of anti-body, had stopped receiving methotrexate at the beginning of the infusion treatment, and had received only infusions of cA2 at weeks 0, 2, 6, 10, and 14 of the trial as having received either "co-administration" or "sequential co-administration" treatment. (*Id.* at 569:13–570:4.)

103. On the contrary, in their published works in peer-reviewed journals and their communications with the editorial staff of several peer-reviewed journals and each other, Professors Maini and Feldmann identified those patients who did not receive weekly methotrexate throughout the T–14 trial as having received cA2 "alone" or cA2 "monotherapy."

104. Furthermore, in these same materials and communications, Professors Maini and Feldmann identified those patients who did receive weekly methotrexate throughout the T–14 trial as having received cA2 in "co-administration with" methotrexate, or in "combination with" methotrexate, or as "combination therapy" with methotrexate.

## VI. KENNEDY'S PATENTS

### A. The '248 Application

105. On October 8, 1992, Kennedy filed U.S. Patent Application No. 07/958,248 ("the '248 application"), which lists Marc Feldmann, Ravinder Maini, and Richard Williams as inventors and is entitled "Treatment of Autoimmune and Inflammatory Disorders." (Ex. 1068.1 at ABT-KEN00008981, –00009002; Tr. at 539:8–25.)

106. The "Summary of the Invention" in the '248 application states that the invention "pertains to the discovery that combination therapy, involving the use of anti-CD4 antibodies in conjunction with anti-TNF antibodies, produces markedly superior results than the use of each agent alone in the treatment of autoimmune or

inflammatory disease, particularly in rheumatoid arthritis." (Ex. 1068.1 at ABTKEN00008985.)

107. The '248 application primarily discusses combination therapy involving an anti-CD4 antibody and an anti-TNF antibody, but the "Detailed Description of the Invention" section of the '248 application further states that "[o]ther anti-inflammatory drugs, such as the anti-rheumatic drugs methotrexate or cyclosporin A, can be administered in conjunction with the anti-CD4 antibody or the anti-TNF antibody." (*Id.* at ABTKEN00008991.)

## B. The '766 Patent

108. The United States Patent and Trademark Office ("PTO") issued the '766 patent on August 7, 2001. The '766 patent names Marc Feldmann and Ravinder Maini as inventors and is entitled "Anti–TNF Antibodies and Methotrexate in the Treatment of Arthritis and Crohn's Disease." The assignee of the patent is the Kennedy Institute of Rheumatology. (Ex. 1, Ex. 1419.1 at ABTKEN00000077; Tr. at 107:21–108:7, 152:18–153:10.)

109. Kennedy had filed the underlying application that led to the '766 patent, U.S. Patent Application No. 08/690,775 (the "'775 application"), on August 1, 1996. (Ex. 1, Ex. 1419.1 at ABTKEN00000068, –00000078; Tr. at 153:2–10.)

110. The '766 patent is part of a family of related patent applications traceable to the filing of the '248 application on October 8, 1992. Through several intervening applications, the '766 patent has an effective filing date of October 8, 1992. (Ex. 1; Ex. 1419.1 at ABTKEN00000077.) By statute, the '766 patent expired twenty years from this date, on October 8, 2012. *See* 35 U.S.C. § 154(a)(2).

## C. The Claims of the '766 Patent

111. Claim 8 of the '766 patent, an independent claim, recites:

> A method of treating rheumatoid arthritis in an individual in need thereof comprising co-administering methotrexate and an anti-tumor necrosis factor alpha antibody or an antigen-binding fragment thereof to the individual, in therapeutically effective amounts. (Ex. 1 at col. 35, lines 59–63.)

112. Claims 9 through 14 of the '766 patent each depend, either directly or indirectly, on claim 8 and add additional limitations to the method of treating rheumatoid arthritis recited in claim 8. (*Id.* at col. 35, line 64–col. 36, line 51.)

113. Specifically, claims 9 through 14 of the '766 patent recite:

> 9. A method of claim 8 wherein the anti-tumor necrosis factor alpha antibody or antigen-binding fragment is administered in a series of doses separated by intervals of days or weeks.

> 10. A method of claim 8 wherein the anti-tumor necrosis factor alpha antibody or antigen-binding fragment is a chimeric antibody or chimeric fragment, wherein said chimeric antibody or chimeric fragment comprises a non-human variable region specific for tumor necrosis factor alpha or an antigen-binding portion thereof and a human constant region.

> 11. A method of claim 10 wherein the chimeric antibody binds to one or more epitopes included in amino acid residues set forth in SEQ ID NO:1 or SEQ ID NO:2.

> 12. A method of claim 10 wherein the chimeric antibody competitively inhibits binding of TNFα to monoclonal antibody cA2.

13. A method of claim 12 wherein the chimeric antibody is monoclonal antibody cA2.

14. A method of claim 8 wherein the anti-TNFα antibody or antigen-binding fragment is a humanized anti-TNFα antibody or antigen-binding fragment thereof. (*Id.*)

### D. The Specification of the '766 Patent[11]

114. The specification of the '766 patent states that

[t]he present invention is based on the discovery that treatment of patients suffering from a TNF-mediated disease with a tumor necrosis factor antagonist, such as an anti-tumor necrosis factor antibody, as adjunctive and/or concomitant therapy to methotrexate therapy produces a rapid and sustained reduction in the clinical signs and symptoms of the disease. (Ex. 1 at col. 2, line 33–39.)

115. The specification also states that the invention "relates to a method of treating and/or preventing rheumatoid arthritis in an individual comprising co-administering an anti-TNF antibody or a fragment thereof and methotrexate to the individual in therapeutically effective amounts." (*Id.* at col. 2, line 66–col. 3, line 3.) The specification continues that the invention relates "to the discovery that tumor necrosis factor antagonists can be administered to patients suffering from TNF-mediated disease as adjunctive and/or concomitant therapy to methotrexate therapy, with good to excellent alleviation of the signs and symptoms of the disease." (*Id.* at col. 4, lines 31–36.)

116. According to the specification,

an "anti-tumor necrosis factor antibody" decreases, blocks, inhibits, abrogates or interferes with TNF activity in vivo. Anti–TNF antibodies useful in the methods and compositions of the present invention include monoclonal, chimeric, humanized, resurfaced and recombinant antibodies and fragments thereof which are characterized by high affinity binding to TNF and low toxicity (including human anti-murine antibody (HAMA) and/or human anti-chimeric antibody (HACA) response). (*Id.* at col. 7, lines 26–34.)

117. The specification discloses the chimeric antibody cA2, which has since been designated as "infliximab" and marketed under the brand name Remicade®. (*Id.* at col. 9, lines 50–64; *see* Tr. at 147:19–20.)

118. The specification lays out several possible routes of administration (Ex. 1 at col. 18, lines 36–48), and states that the two therapies can be administered at different frequencies from each other: "TNF antagonists can be administered prior to, simultaneously with (in the same or different compositions) or sequentially with the administration of methotrexate. For example, TNF antagonists can be administered as adjunctive and/or concomitant therapy to methotrexate therapy." (*Id.* at col. 18, lines 58–62.)

119. The specification provides that the antibody and methotrexate are each administered in a "therapeutically effective amount," which means "that administration of TNF antagonist and methotrexate, or administration of a composition of the present invention, results in inhibition of the biological activity of TNF relative to the biological activity of TNF when therapeutically effective amounts of antagonist

11. As discussed *infra* (*see supra* ¶ 280), the Court considers the specification of the '766 patent only for the purposes of construction of its claims. *See Eli Lilly v. Teva Parenteral Medicines, Inc.*, 689 F.3d 1368, 1378–81 (Fed. Cir.2012).

and methotrexate are not administered, or relative to the biological activity of TNF when a therapeutically effective amount of the composition is not administered." (*Id.* at col. 19, lines 18–26.)

120. The specification further explains that "[a] therapeutically effective amount is preferably an amount of TNF antagonist and methotrexate necessary to significantly reduce or eliminate signs and symptoms associated with a particular TNF-mediated disease." (*Id.* at col. 19, lines 26–30.)

121. The specification of the '766 patent contains three examples. (*Id.* at col. 20, line 37–col. 34, line 49.) The examples are based on human clinical trials involving rheumatoid arthritis patients. (*Id.;* Tr. at 155:10–156:5.)

122. These three examples were included in the '775 application. (Ex. 1419.1 at ABTKEN00000118–47.)

123. Example 1 of the '766 patent is drawn from the T–14 study undertaken by Professors Maini and Feldmann. (Tr. at 155:10–20; *see id.* at 508:10–13; *see also* ¶¶ 83–92.) This study was designed to evaluate the safety and efficacy of chimeric anti-TNFα antibody cA2 in multiple infusions, alone or in combination with methotrexate, in the treatment of rheumatoid arthritis patients. (Ex. 1 at col. 20, lines 43–49; *see* Ex. 1025 at 1552.)

124. The specification of the '766 patent notes that the patients enrolled in the T–14 study had been previously treated with methotrexate for at least six months, although they still had "active disease." (Ex. 1 at col. 20, lines 51–56; *see also supra* ¶ 85.) A patient had "active disease," as used in Example 1, if he or she had six or more swollen joints plus as least three of four secondary conditions, such as prolonged morning stiffness or tender or painful joints. (Ex. 1 at col. 20, lines 56–61; *see* Tr. at 158:5–8.)

125. Although the patients in the T–14 study were taking methotrexate and still had active disease, that does not mean the patients were necessarily receiving no benefit from the methotrexate treatment. By August 1995, it was understood that rheumatoid arthritis patients treated with methotrexate might exhibit partial relief of their symptoms, but still have active disease. (*See, e.g.,* Ex. FF at ABT-KEN00444962; Ex. 1408.1 at ABT-KEN00444909; Tr. at 174:25–177:3.) As described in the '766 patent, there is no way to determine if the T–14 study participants were partial responders to chronic methotrexate treatment or complete non-responders.

126. The specification of the '766 patent recounts, as described above (*see supra* ¶ 87), that the T–14 study was designed with separate "arms" to compare the effect of various doses of an anti-TNFα antibody alone or in combination with methotrexate. (Ex. 1 at col. 20, lines 43–49; *id.* at col. 21, lines 13–24.)

127. The specification also states that the anti-TNFα chimeric antibody cA2 was administered to study participants by intravenous infusion. (*Id.* at col. 21, lines 2–12.)

128. As the specification notes, the patients were randomly placed into one of seven treatment arms. The patients in the control arm received methotrexate tablets and infusions of a placebo throughout the trial. The patients in the three arms that received methotrexate tablets and antibody infusions throughout the trial received methotrexate at 7.5 mg a week and either 1, 3, or 10 mg/kg of cA2, respectively. The patients in the three arms that received placebo tablets and cA2 infusions throughout the trial received weekly placebo instead of methotrexate and received either 1, 3, or 10 mg/kg of cA2, respectively. (*Id.* at Table 1.) Patients received antibody (or placebo) infusions at weeks 0, 2,

6, 10, and 14 of the trial. (*Id.* at col. 21, lines 15–18.) There was no washout period between the last dose of "stabilizing" methotrexate and the assignment of patients to their treatment arm for the trial. (Tr. at 521:4–7.)

129. The specification visualized the administration groups and arms in Table 1, with the three arms for patients who received methotrexate and each respective dose of cA2 throughout the trial being indicated as "MTX+" and the three arms for patients who received placebo and each respective dose of cA2 throughout the trial being indicated as "MTX-":

TABLE 1

| Baseline Disease Characteristics Joint Counts | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Treatment Groups | | | | | | | | |
| Placebo | 1 mg/kg cA2 | | 3 mg/kg cA2 | | 10 mg/kg cA2 | | All | Treatment effect |
| MTX+ | MTX+ | MTX- | MTX+ | MTX- | MTX+ | MTX- | Patients | p-value |

(Ex. 1 at col. 21–22.)

130. The specification explains that patients in the study were evaluated at various intervals for 26 weeks using six primary disease-activity assessments and the Paulus index, which is used by rheumatologists to measure the clinical response to drugs in clinical trials. (*Id.* at col. 21, line 24–col. 22, line 23; Tr. at 142:3–22.)

131. The specification of the '766 patent further recounts that in the T–14 study, high clinical response rates were obtained with a multiple dose regimen of 3 mg/kg of cA2 in combination with weekly doses of 7.5 mg of methotrexate. Similar results were also obtained at the higher dose of 10 mg/kg of cA2 with weekly doses of 7.5 mg of methotrexate. The specification states that the 3 mg/kg dose of cA2 is "preferable to the 1 mg/kg plus methotrexate regimen because better pharmacokinetics are obtained, virtually no immune response was detected and the clinical response is better sustained following the last treatment with cA2." (Ex. 1 at col. 31, lines 23–34.).

132. The specification states that "the results of this study indicate that treatment with multiple infusions of cA2 as adjunctive and/or concomitant therapy to methotrexate therapy is an important and efficacious therapeutic approach for treating [rheumatoid arthritis] in patients." (*Id.* at col. 31, lines 44–48.)

133. Tables 2 through 5 of the specification of the '766 patent tabulate the results of the T–14 study, and, like Table 1, identify the treatment the groups of patients received as either "MTX+" or "MTX-" depending on whether during the infusion period of the trial they received cA2 and methotrexate or cA2 alone, respectively. (*See id.* Tables 2–5.)

134. The specification of the '766 patent summarized the T–14 study, stating that "the results of this study indicate that treatment with a multiple dose regimen of cA2 as adjunctive and/or concomitant therapy to methotrexate therapy, in [rheumatoid arthritis] patients whose disease is incompletely controlled by methotrexate, produces a highly beneficial or synergistic clinical response that can be sustained through 26 weeks." (*Id.* at col. 31, lines 35–40.)

135. The synergy reported in the T–14 study, as submitted in the '775 application and recited in the '766 patent specification, is based on a comparison of the results of co-administration of both drugs to the re-

sults of the administration of either drug alone. (Ex. 1419.1 at ABTKEN00001235–37; Tr. at 237:17–243:12.)

136. Example 2 of the '766 patent reported a clinical study in which rheumatoid arthritis patients with active disease despite receiving chronic methotrexate treatment were given either the anti-TNFα antibody cA2 or a placebo. (Ex. 1 at col. 31, line 60–col. 32, line 3; Tr. at 155:21–25.)

137. "Active disease" for Example 2 is defined the same as in Example 1. (Ex. 1 at col. 31, line 65–col. 32, line 3.)

138. In this study, the patients received a weekly dose of 10 mg of methotrexate for at least four weeks prior to the study and then received a single administration of either the antibody cA2 or a placebo at a dose of 5, 10, or 20 mg/kg. (Id. at col. 31, line 54–65, Table 7; Tr. at 237:17–243:12.)

139. All of the patients in the study continued to receive a weekly dose of 10 mg of methotrexate throughout the duration of the twelve week trial. No patients in this study received antibody alone without methotrexate. (Ex. 1 at col. 32, lines 22–24.)

140. The specification of the '766 patent explains a single dose of antibody cA2, particularly at the 10 mg/kg and 20 mg/kg doses, produced a clinical response that was sustained for as long as twelve weeks after a single treatment. (Id. at col. 32, line 67–col. 33, line 4.)

141. The specification states that "the results of this study indicate that treatment with cA2 as adjunctive and/or concomitant therapy to methotrexate therapy is effective in the reduction of the signs and symptoms of rheumatoid arthritis in patients whose disease is incompletely controlled by methotrexate." (Id. at col. 33, lines 19–23.)

142. Example 3 of the '766 patent specification is a continuation of the clinical trial described in Example 2. Twenty-three patients from the study were administered 10 mg/kg of antibody cA2 in an open label format at weeks 12, 20, and 28. During this period of the extension study, the patients continued to receive methotrexate administered at a dose of 10 mg/week. (Id. at col. 33, lines 35–50; Tr. at 156:1–5.)

143. As in Example 2, none of the patients in Example 3 received antibody alone. (Ex. 1 at col. 33, lines 35–49.)

144. In all three examples in the '766 patent specification, the clinical studies involved "adjunctive" therapy, wherein patients who had active rheumatoid arthritis, despite receiving methotrexate, continued to receive weekly methotrexate, and infusions of anti-TNFα antibody (at some interval) were added to this treatment. (Tr. at 159:6–9; see id. at 515:20–25; see generally Test. of Dr. Michael Weinblatt (describing and defining "adjunctive" therapy as adding one therapy to another, ongoing treatment).[12])

145. The adjunctive therapy shown in the three examples of the '766 patent specification is one of three possible methods of "co-administration" of methotrexate and

**12.** To the extent that the testimony of Abbott's expert, Dr. Weinblatt, and Kennedy's expert, Dr. Lipsky, conflicted, the Court credits Dr. Weinblatt's testimony. While both are eminently qualified as experts and leaders in the field of rheumatology, Dr. Weinblatt's testimony was clearer, more consistent, more responsive, and more reflective of the other evidence in the record. Furthermore, his demeanor was the same on cross-examination as it was on direct. On the other hand, Dr. Lipsky appeared to regard almost any question, other than from Kennedy's counsel, as an opportunity to engage in a debate. Dr. Lipsky's frequently argumentative and nonresponsive testimony detracted from his substantive points.

an anti-TNFα antibody. In the parlance of "genus" and "species," "co-administration" is the "genus" under which there are three "species," or possible methods of co-administration, or ways to give two drugs to a patient: (1) treatment with methotrexate and antibody is started at the same time; (2) treatment with antibody is begun first and treatment with methotrexate is then added later while treatment with antibody continues; or (3) treatment with methotrexate is begun first and treatment with antibody is then added later while treatment with methotrexate continues. The latter two methods of co-administration constitute "adjunctive" therapy. (Tr. at 224:1–19.)

146. The '766 patent only provides examples where patients received adjunctive anti-TNFα antibody therapy with continuing methotrexate treatment. The examples do not include any situations in which patients began both drugs at the same time or started antibody first and added methotrexate; such treatment scenarios were (and are) unlikely because patients frequently were put on methotrexate treatment first and their responses evaluated to such treatment alone, before antibody treatment was considered, due to both the heightened intensity and expense of antibody treatment. (Id. at 224:20–225:11.)

E. **Prosecution History of the '766 Patent**

147. The original '775 application, filed on August 1, 1996, from which the '766 patent issued, included a total of 31 claims. (Ex. 1419.1 at ABTKEN00000068, – 00000154–57.)

148. Claim 1 in the '775 application was directed toward "[a] method for treating or preventing a tumor necrosis factor-mediated disease in an individual in need thereof comprising co-administering methotrexate and an anti-tumor necrosis factor antibody or fragment thereof to the individual, in therapeutically effective amounts." (Id. at ABTKEN00000154.)

149. Claim 10 in the '775 application was directed toward "[a] method for treating or preventing rheumatoid arthritis in an individual in need thereof comprising co-administering methotrexate and an anti-tumor necrosis factor antibody to the individual, in therapeutically effective amounts." (Id. at ABTKEN00000155.)

150. Claims 11 and 12, which were dependent on Claim 10, referred to methods in which the anti-TNFα antibody and methotrexate were administered "simultaneously" and "sequentially," respectively. (Id.)

151. Through several intermediate steps, Kennedy in the '755 application claimed priority back to the '248 application and its filing date of October 8, 1992. (Id. at ABTKEN00000079.)

152. On March 3, 1997, in the first "Office action," the PTO rejected the pending claims. (Id. at ABTKEN00000587–95.) The PTO examiner denied the claimed priority date of the '248 application, stating that certain of the claims were not supported by the earlier applications that related back, and deemed the filing date of the claims to be August 1, 1996. (Id. at ABTKEN00000588.) The examiner also rejected the claims under 35 U.S.C. §§ 103 and 112. (Id. at ABTKEN00000588–94.)

153. Kennedy filed a response on September 3, 1997, "Amendment A," which included amendments to the specification and claims, arguments responding to the objections and rejections set forth by the examiner in the first Office action, and Kennedy's reply to the examiner's denial of a priority date for the '775 application back to the earlier filed applications. (Id. at ABTKEN00000620–45, –00000656–57.)

154. In Amendment A, Kennedy argued against the examiner's rejections under 35 U.S.C. §§ 103 and 112, referring to the claimed invention as "co-administration" or "coadministering" of methotrexate and anti-TNFα antibody (or antagonist). (*Id.* at ABTKEN00000627, –00000630, –100000644–45.)

155. Kennedy stated, "Applicants have exemplified the claimed methods using monoclonal anti-TNFα antibody cA2 in patients with active rheumatoid arthritis (see specification, e.g., Examples 1–3)." (*Id.* at ABTKEN00000628.)

156. Kennedy responded to the examiner's rejections under 35 U.S.C. § 103 by arguing that the claimed co-administration methods resulted in unexpected results. Specifically, Kennedy argued that it had demonstrated the unexpected result that combination therapy with methotrexate and an anti-TNFα antibody produced a rapid and sustained reduction in the clinical signs and symptoms of the treated autoimmune disease (see specification, e.g., page 4, lines 2–8; and Example 2). Applicants also demonstrated the unexpected and dramatic result that combination therapy with methotrexate and a multiple dose regimen of an anti-TNFα antibody produced markedly superior results than the results obtained with each agent alone, particularly at low doses of methotrexate (see specification, e.g., page 4, lines 9–19 [ [13]]; Examples 1–3). The magnitude of these results in the treatment of autoimmune or inflammatory disease could not have been reasonably predicted from the cited references, as illustrated in, for example, Figures 1A, 2A, 3A, 4A, 5A and Figure 7 of the specification. (*Id.* at ABTKEN00000644.)

157. The data that Kennedy relied on to establish unexpected results of the claimed co-administration methods included Examples 1, 2, and 3 of the specification. (*Id.*)

158. In referring to the unexpected results that "combination therapy" produced, as compared to "each agent alone," this latter designation covered both the group of patients in Example 1 who received methotrexate and infusions of placebo (instead of antibody) throughout the T–14 study, as well as the group of patients who stopped receiving methotrexate at the beginning of the infusion treatment and received infusions of antibody throughout the trial. Kennedy's description of these two groups in Amendment A as having received "each agent alone" corresponds to what Professors Maini and Feldmann referred to as "monotherapy" in their published article on the T–14 study. (Tr. at 234:5–235:1; Ex. 1025 at 1553, 1560.)

159. On December 9, 1997, the PTO mailed a second Office action, again rejecting all of the pending claims. (Ex. 1419.1 at ABTKEN00000659–66.) In this action, the examiner again denied Kennedy's claim for priority, stating that Kennedy had not provided adequate support for the priority of the asserted claims, and as a result, the effective filing date of the '755 application remained August 1, 1996. (*Id.* at ABTKEN00000660.)

---

**13.** Here, the specification states that: "The present invention is also based on the unexpected and dramatic discovery that a multiple dose regimen of a tumor necrosis factor antagonist, such as an anti-tumor necrosis factor antibody, *when administered adjunctively* with methotrexate to an individual suffering from a TNF-mediated disease produces a highly beneficial or synergistic clinical response for a significantly longer duration compared to that obtained with a single or multiple dose regimen of the antagonist administered alone or that obtained with methotrexate administered alone." (Ex. 1419.1 at ABTKEN00000082 (emphasis added).)

160. In rejecting Kennedy's unexpected results argument, the examiner noted, with respect to Example 1, that

the instant specification discloses that: the results of the study indicate that treatment with a multiple dose regimen of cA2 as adjunctive and/or concomitant therapy to methotrexate therapy, in [rheumatoid arthritis] patients whose disease is incompletely controlled by methotrexate, produces a highly beneficial or synergistic clinical response that can be sustained through 26 weeks.... Accordingly, the results of this study indicate that treatment with multiple infusions of cA2 as adjunctive and/or concomitant therapy to methotrexate therapy is an important and efficacious therapeutic approach for treating [rheumatoid arthritis] in patients. (*Id.* at ABTKEN00000663.)

161. With regards to Example 2, the examiner stated that

the instant specification discloses that: the results of the study indicate that treatment with cA2 as adjunctive and/or concomitant therapy to methotrexate therapy is effective in the reduction of the signs and symptoms of rheumatoid arthritis in patients whose disease is incompletely controlled by methotrexate.... Accordingly, the results of this study indicate that treatment with cA2 as adjunctive and/or concomitant therapy to methotrexate therapy is an important and efficacious therapeutic approach for treating [rheumatoid arthritis] in patients. (*Id.*)

162. The examiner rejected the pending claims, despite recognizing that Exam-

ples 1 and 2—demonstrating adjunctive therapy—showed improved treatment results. (*Id.*)

163. On June 8, 1998, Kennedy responded to the second Office action with "Amendment B." (*Id.* at ABT-KEN00000997–1016.) Kennedy argued that the '775 application was entitled to the priority filing date of the '248 application, stating that "[a]t page 10, lines 6–9, the '248 application specifically recites the use of methotrexate in conjunction with an anti-TNF antibody." (*Id.* at ABT-KEN00000998.) As such, Kennedy argued that "the '248 specification provides support for these claims" and "[a]ccordingly, the claims are entitled to a priority date of October 8, 1992, the filing date of the '248 application." (*Id.* at ABTKEN00000999.[14])

164. In response to the examiner's rejection under 35 U.S.C. § 112, first paragraph, that the specification did not sufficiently enable the claimed methods, Kennedy argued that "the present specification provides human clinical data of the claimed co-administration." (*Id.* at ABTKEN00001001 (emphasis omitted).)

165. In Amendment B, Kennedy responded to the examiner's rejection under 35 U.S.C. § 103 by noting first that "Applicants' invention relates to methods of treating ... rheumatoid arthritis (claims 10–17) ... in an individual comprising co-administering methotrexate and an anti-TNFα antibody[.]" (*Id.* at ABT-KEN00001004.)

166. In response to the examiner's rejection for obviousness and the examiner's

---

14. Although not directly at issue in this obviousness-type double patenting challenge, Professor Maini testified that—contrary to Kennedy's representations to the PTO throughout the patent prosecution process that the 1992 '248 application supported the claims of co-administration of methotrexate and an anti-

TNFα antibody—these representations were incorrect and not accurate because at the time of the '248 application the inventors had not yet conceived of the use of methotrexate in combination with anti-TNFα antibody for the treatment of rheumatoid arthritis. (Tr. at 539:3–551:25.)

comments in the second Office action with regard to Examples 1 and 2 of the specification, Kennedy repeated its argument that those examples demonstrated unexpected results of combination therapy with methotrexate and a TNFα antagonist, stating:

the Examiner's summary of the results disclosed in Example 1 is consistent with Applicants' assertions relating to the same example: that combination therapy with methotrexate and anti-TNFα produced markedly superior results than the results obtained with each reagent alone, particularly at low doses of methotrexate and that significant improvement of the combination therapy was observed even in comparison to where optimal dosages of anti-TNFα antibody were administered alone (see Amendment A at page 25). The Examiner's summary of the results disclosed in Example 2 is also consistent with Applicants' assertion relating to the same example: that combination therapy with methotrexate and anti-TNFα antibody produced a rapid and sustained reduction in the signs and symptoms of the treated autoimmune disease (see Amendment A at page 25). (*Id.* at ABT-KEN00001006–07.)

167. On September 1, 1998, the PTO mailed an Office action rejecting the pending claims for the third time and denying Kennedy's request for the priority date of the '248 application. (*Id.* at ABT-KEN00001124–28.)

168. In denying Kennedy's asserted priority to the '248 application, the examiner stated that the '775 application's "limitations drawn to modes of administration encompassing 'simultaneously,' 'sequentially' and 'multiple doses' do not appear to receive written support or priority to" the '248 application, and "it does not appear that these various modes of administration

as they encompass the instant combination of anti-TNF antibodies (or TNF antagonists) and methotrexate are supported in" the '248 application. (*Id.* at ABT-KEN00001125.)

169. The examiner again rejected Kennedy's claims as being obvious under 35 U.S.C. § 103 in view of several references in the prior art. (*Id.* at ABT-KEN00001126–28.) Responding to Kennedy's argument that the combination of methotrexate and an anti-TNFα antibody showed unexpected results, the examiner explained that

applicant's arguments rely, in large part, to asserted *synergistic effects disclosed in the instant examples, however it is noted that such effects were observed with certain patient populations with certain dosing. Such particular patient populations and particular dosing regimens are not claimed.* (*Id.* at ABTKEN00001127 (emphasis added).)

170. After the third Office action was made final (*see id.* at ABTKEN00001128), Kennedy filed a Notice of Appeal on March 1, 1999, and an Appeal Brief on September 3, 1999, appealing the rejection of all the claims remaining in the application. (*Id.* at ABTKEN00001131–82.)

171. The Appeal Brief argued that

[t]he present invention relates to the discovery that a TNFα antagonist can be administered to patients suffering from a TNF-mediated disease (such as an autoimmune or inflammatory disease) as adjuvant or concomitant therapy to methotrexate therapy, with a rapid and sustained reduction in the clinical signs and symptoms of the disease. The present invention also relates to the unexpected discovery that a multiple dose regimen of a TNFα antagonist can be administered to patients suffering from a TNF-mediated disease as adjuvant or concomitant therapy to methotrexate

therapy, with a highly beneficial or synergistic clinical response for a significantly longer duration compared to that obtained with a single or multiple dose regimen of the antagonist administered alone or that obtained with methotrexate administered alone. (*Id.* at ABT-KEN00001137.)

172. Kennedy also argued "that the pending claims are entitled to a priority date of October 8, 1992, the filing date of the '248 application," again relying, *inter alia,* on "page 10, lines 6–9, [of] the '248 application[, which] specifically recites the use of methotrexate in conjunction with an anti-TNF antibody." (*Id.* at ABT-KEN00001139.)

173. Kennedy further contested the examiner's rejections for obviousness under 35 U.S.C. § 103, again relying on Examples 1, 2, and 3 of the specification as evidence of the unexpected results of combination therapy, stating that

Appellants demonstrated the unexpected result that combination therapy with methotrexate and a TNFα antagonist produced unexpected synergistic effects between methotrexate and the TNFα antagonist (see, e.g., Figures 1A, 2A, 3A, 4A, 5A and Table 4 of the specification). Appellants also demonstrated the unexpected result that significantly reduced immunogenicity of anti-TNFα antibodies was obtained with combination therapy with methotrexate (see, e.g., page 57, line 30 to page 60, line 4, including Table 6, of the specification). Appellants further demonstrated the unexpected result that combination therapy with methotrexate and a TNFα antagonist produced high clinical response rates for significantly longer durations in comparison with that obtained with treatment with each therapeutic modality separately (see specification, e.g., page 4, lines 8–

18; Examples 1–3 . . .). (*Id.* at ABT-KEN00001154.)

174. On November 23, 1999, the PTO examiner reopened prosecution by issuing a fourth Office action. (*Id.* at ABT-KEN00001183–98.) The examiner determined that the '248 application did support certain claims of the '775 application, including claim 10, which was directed to treating rheumatoid arthritis, and granted these claims an effective filing date of October 8, 1992. (*Id.* at ABTKEN00001184.) The examiner maintained the rejection of certain claims under 35 U.S.C. § 112, first paragraph, for lack of enablement. (*Id.* at ABTKEN00001187–88.) The examiner also rejected all of the claims under 35 U.S.C. § 102(e) as being anticipated by several references, as well as under 35 U.S.C. § 103. (*Id.* at ABTKEN00001189–97.)

175. In response to Kennedy's arguments regarding the asserted synergistic benefits disclosed in Examples 1, 2, and 3, the examiner elaborated on one of the bases for the previous rejections and stated in the fourth Office action that

[A]pplicant[s'] arguments rely, in large part, to the asserted synergistic effects disclosed in the instant examples. *Applicant[s'] asserted synergistic effects are based on the comparison of each therapeutic modality used separately. Also, it has been noted that such effects were observed with certain patient populations with certain dosing. The putative synergistic effects relate to a particular multiple dose regiment of* [sic] *based upon cA2 and methotrexate therapy in rheumatoid arthritis patients whose disease is incompletely controlled by methotrexate* (see page 62, paragraph 3 and page 66, paragraph 3 of the specification). *Such particular patient populations, and particular dosing regimens are not claimed.*

Also, it is noted that such effects observed with certain patient populations with certain dosing regimens does not discount the well known use and expectation of success in combining therapeutic agents to treat diseases. (*Id.* at ABTKEN00001196 (emphasis added).)

176. The examiner thus noted that of the three overarching treatment groups of patients—those who entered the study on methotrexate and continued receiving methotrexate and placebo, those who entered the study on methotrexate, continued to receive methotrexate, and also received antibody, and those who were receiving methotrexate, ceased receiving methotrexate at entry, but received antibody during the study—the putative synergistic benefits were experienced by the second (i.e., the group who stayed on methotrexate and received adjunctive cA2 treatment). The examiner explained that the unexpected results did not extend to the more broadly claimed "co-administration" methods generally (i.e., the evidence of unexpected results proffered only supported claims for the cA2 adjunctive therapy "species," not the entire "genus" of co-administration). (Tr. at 239:7–241:4.) As such, the examiner refused to allow a broader claim to all ways of co-administering methotrexate and anti-TNFα antibody, as the evidence in Examples 1, 2, and 3 were not necessarily representative of the broader coverage sought, but merely of the cA2 adjunctive therapy.

177. The examiner continued:

The nonobviousness of a broader claim can be supported by evidence based on unexpected results from testing a species contained within the claim if one of ordinary skill in the art would be able to determine a trend in the exemplified data which would allow the artisan to reasonably extend the probative value thereof to the broader claim.... Here,

however, ... it does not appear that the specification provides sufficient objective evidence to extend unexpected results showing contained herein based upon the asserted synergistic effects of this combination therapy in rheumatoid arthritis patients who were resistant to conventional therapy with methotrexate. (Ex. 1419.1 at ABTKEN00001197 (citations omitted).)

178. The examiner highlighted this distinction in comparing the scope of the methods claimed in the '248 application and the '775 application:

[A]pplicant[s'] assertion of synergistic results based upon by [sic] the limited clinical results [in] rheumatoid arthritis patients who were resistant to conventional therapy with methotrexate in the instant application appears inconsistent with applicant[s'] assertion of priority; wherein [the '248 application] simply disclosed that other anti-inflammatory agents such as methotrexate can be administered in conjunction with anti-TNF antibodies. (*Id.*)

179. On May 23, 2000, Kennedy mailed a response, "Amendment C," to the fourth Office action, in which it amended two claims and argued that all the claims in the subject application should be entitled to the same benefit of a priority date of the '248 application. Kennedy also continued to argue against the 35 U.S.C. § 112, first paragraph, rejection based on lack of an enabling disclosure. (*Id.* at ABTKEN00001216–39.)

180. In response to the examiner's rejections for obviousness under 35 U.S.C. § 103, Kennedy asserted that the clinical data in the specification evidenced that

Applicants demonstrated the unexpected result that combination therapy with methotrexate and a TNFα antagonist produced unexpected synergistic effects between methotrexate and the TNFα

antagonist (see, e.g., Figures 1A, 2A, 3A, 4A, 5A and Table 4 of the specification).... Applicants further demonstrated the unexpected result that combination therapy with methotrexate and a TNFα antagonist produced high clinical response rates for significantly longer durations in comparison with that obtained with treatment with each therapeutic modality separately (see specification, e.g., page 4, lines 8–18; Examples 1–3 ...). (*Id.* at ABT-KEN00001235.)

181. Kennedy's argument compared the group of patients who received methotrexate and placebo and the group who stopped receiving methotrexate at entry but received infusions of antibody throughout the study, to the group of patients who continued to receive methotrexate and also received antibody infusions, and asserted that there was an unexpected synergistic response when the two drugs were combined. (Tr. at 237:17–239:6.)

182. Responding to the examiner's statements in the fourth Office action that the synergistic effects were observed only with "certain patient populations with certain dosing," and that "[s]uch particular patient populations and particular dosing regimens are not claimed," Kennedy argued that

[t]here is no technical reason to believe that the synergistic effects exemplified in the specification by combination therapy with methotrexate and a TNFα antagonist is limited to a certain patient population. That is, *there is no technical reason to believe that treatment with a combination of methotrexate and a TNFα antagonist, in accordance with Applicants' teachings, would not yield the superior therapeutic effects described in the subject application. The superior therapeutic effects are due to co-administration of methotrexate and a TNFα antagonist* functionally limited to therapeutically effective amounts, as described in the specification. (Ex. 1419.1 at ABTKEN00001236 (emphasis added).)

183. Thus, Kennedy, drawing supporting data from the clinical trials in Examples 1, 2, and 3, in which a TNFα antagonist was administered as adjunctive therapy to patients with an inadequate response to ongoing methotrexate treatment, argued that these data were representative of the broader genus of "co-administration" of methotrexate and a TNFα antagonist to treat patients with rheumatoid arthritis (i.e., Kennedy argued that the results observed in the cA2 adjunctive treatment group were representative of what one would expect when co-administering methotrexate and anti-TNFα antibody generally). (Tr. at 241:5–242:13.)

184. In its prosecution of the '775 application, Kennedy did not distinguish between the antibody adjunctive treatment group, in which patients on continuing methotrexate were given infusions of cA2, and either of the other possible methods of co-administration—starting patients on both antibody and methotrexate at the same time or starting patients on antibody first then adding methotrexate treatment later—because the T–14 trial did not study either of these methods. (*Id.* at 242:14–23.)

185. Furthermore, in the entirety of the '766 patent file history, Kennedy never suggested that there was an additional form of co-administration—distinct from one in which antibody was administered as adjunctive therapy to ongoing methotrexate—in which antibody was administered as "sequential co-administration" to the methotrexate therapy. (*Id.* at 242:24–243:4; *see also id.* at 564:1–13.)

186. As Professor Maini testified at trial, this is consistent with the subsequently

published article on the T–14 study, in which the patients who received infusions of cA2 were described as being given antibody either "alone or in combination with" methotrexate, and where "co-administration" referred to the group who had received cA2 adjunctive therapy added to ongoing methotrexate treatment. Professor Maini testified that the patients who stopped receiving methotrexate upon entry to the T–14 trial at week 0 and received infusions of cA2 throughout the trial were not referred to in the published study as having received "sequential coadministration" because the phenomenon of these patients experiencing superior results at the beginning of the trial was not "scientifically proven to be due to sequential coadministration ... [and] because it was not scientifically proven, as a scientist, I did not think it was appropriate to draw attention to a phenomenon that I could not scientifically support, and therefore, I haven't referred to it." Professor Maini explained that this phenomenon "wasn't the subject of what I believed that our study had proven conclusively, which was adjunctive therapy." (*Id.* at 564:14–570:24; *see id.* at 523:9–525:15.)

187. After a June 13, 2000 interview between the examiner, Kennedy's counsel, Professor Feldmann, and others, Kennedy filed a Supplemental Amendment on August 7, 2000, and indicated that at the interview Kennedy and the PTO examiner had agreed that each of the pending claims was entitled to a priority date of October 8, 1992, the filing date of the '248 application.[15] (Ex. 1419.1 at ABTKEN00001242–53.)

188. On October 25, 2000, the examiner issued a Notice of Allowability indicating that the application, and all the claims therein, were allowable. (*Id.* at ABT-KEN00001288.) The examiner's reasons for allowance indicated that the pending claims were deemed allowable upon reconsideration of Kennedy's amended claims and arguments, and in view of the unexpected results. (*Id.* at ABT-KEN00001290.)

189. On August 7, 2001, the PTO issued the '766 patent. (Ex. 1.)

F. The '004 Application

190. Shortly after the Notice of Allowability of the '766 patent, on January 3, 2001, Kennedy filed Application No. 09/754,004 (the "'004 application") as a continuation application of the '775 application. The '004 application named Professors Maini and Feldmann as inventors and the Kennedy Institute of Rheumatology Trust as assignee. (Ex. 1423.1 at ABT-KEN00032566–32710.)

191. The '004 application claimed priority to the '248 application through the same series of applications as the '775 application. (*Id.* at ABTKEN00032646.)

192. Original claim 1 was directed to "[a] method for treating or preventing a tumor necrosis factor-mediated disease in an individual in need thereof comprising co-administering methotrexate and a TNFα antagonist to said individual, in therapeutically effective amounts." (*Id.* at ABTKEN00032701.)

193. Original claim 29 was directed to "[a] method for treating or preventing rheumatoid arthritis in an individual in

15. With the PTO's acquiescence to the 1992 priority date of the '248 application, Kennedy was able to avoid much prior art in its ultimately successful prosecution of the '766 patent. *See* 35 U.S.C. § 102(b). Regardless of whether this was an appropriate action to take (*see supra* n. 14), Kennedy's repeated claims to the priority date of the '248 application demonstrate its strategy to avoid this prior art even though it resulted in an earlier expiration date of the '766 patent.

need thereof comprising co-administering methotrexate and a TNFα antagonist to said individual, in therapeutically effective amounts." (*Id.* at ABTKEN00032703.)

194. Original claims 30 and 31 were directed to methods of claim 29 wherein the TNFα antagonist and methotrexate were administered "simultaneously" and "sequentially," respectively. (*Id.* at ABT-KEN00032703–04.)

195. In an Office action mailed December 9, 2002, the examiner rejected all of the pending claims. (*Id.* at ABT-KEN00033087–88.) The examiner did not grant the '004 application the benefit of the October 8, 1992 filing date of the '248 application, explaining that the priority applications did not support the pending claims. Accordingly, the filing date of the '004 application was deemed to be August 1, 1996. (*Id.* at ABTKEN00033090.)

196. The examiner also rejected the pending claims on several grounds under 35 U.S.C. §§ 101, 102, 103, 112 and under the judicially-created doctrine of obviousness-type double patenting over claims the '766 patent. (*Id.* at ABTKEN00033091–95.)

197. On June 17, 2003, Kennedy submitted an amendment in response to the December 9, 2002 Office action. Kennedy amended its claims and the first paragraph of the specification and maintained the asserted priority date of the '248 application. (*Id.* at ABTKEN00033122–23, –00033098, –00033111–12, –00033099.) Kennedy characterized the invention as "methods for treating or preventing an inflammatory disease in an individual in need thereof comprising co-administering methotrexate and a TNFα antagonist to said individual, in therapeutically effective amounts." (*Id.* at ABTKEN00033100.)

198. Kennedy argued that its invention was not obvious under 35 U.S.C. § 103 by, in part, highlighting the claimed

unexpected results of treating an inflammatory disorder with a combination of methotrexate and a TNF antagonist. These results are exemplified by the data set forth in Figures 1A, 2A, 3A, 4A, 5A and Table 4 of the specification. [Kennedy also draws] the Examiner's attention to the unexpected result that combination therapy with methotrexate and a TNF antagonist produced high clinical response rates for significantly longer durations in comparison with that obtained with treatment with each therapeutic modality separately (see, e.g., page 3, lines 18–24, Examples 1–3; particularly, page 35, lines 5–8, page 37, lines 1–3, pages 36–37 (Table 3), pages 38–39 (Table 4), page 46, line 24 through page 47, line 8 of Example 1; page 48, line 20 through page 50, line 8 of Example 2; and page 51, lines 8–32 of Example 3). (*Id.* at ABTKEN00033105.)

199. The June 17, 2003 amendment did not respond to the examiner's obviousness-type double patenting rejection. (*Id.* at ABTKEN00033098–33112, –0033122–23.)

200. On November 4, 2003, the examiner mailed another Office action rejecting the pending claims. (*Id.* at ABT-KEN00033334–41.) The examiner stated that while Kennedy's amendment again sought the October 8, 1992 priority date of the '248 application, it "did not address" the examiner's position that the pending claims were not supported by the earlier application; accordingly, the examiner maintained the August 1, 1996 effective filing date. (*Id.* at ABTKEN00033336.) The examiner also rejected Kennedy's arguments in response to the rejections under 35 U.S.C. §§ 102 and 103. (*Id.* at ABTKEN00033337–40.)

201. In the November 4, 2003 Office action, the examiner also stated that in the absence of any rebuttal from Kennedy to the examiner's rejection under the doctrine of obviousness-type double patenting, "[i]t appears that applicant has acquiesced to the double patenting rejection of record." (*Id.* at ABTKEN00033340.)

202. On February 4, 2004, Kennedy sent its response to the November 4, 2003 Office action, again repeating the argument that the '004 application was entitled to the 1992 priority date of the '248 application, and specifically argued that "[a]t page 10, lines 6–9, the '248 Application specifically teaches the use of methotrexate in conjunction with an anti-TNF antibody." (*Id.* at ABTKEN00033345.)

203. In responding to the rejections for obviousness under 35 U.S.C. § 103, Kennedy relied on the same evidence of unexpected results as in the prior amendment. (*Id.* at ABTKEN00033351–52; *see supra* ¶ 198.)

204. Kennedy also stated that it inadvertently failed to respond to the examiner's obviousness-type double patenting rejection. Kennedy stated that it intended to file a terminal disclaimer with regards to the '766 patent "once the claims are otherwise in condition for allowance." (Ex. 1423.1 at ABTKEN00033355.)

205. On March 26, 2004, the examiner mailed an Advisory Action maintaining the prior rejections (*id.* at ABTKEN00033357–59), to which Kennedy responded in a supplemental amendment on August 6, 2004 (*id.* at ABTKEN00033366–402). The supplemental amendment referenced a May 4, 2004 notice of appeal and a July 27, 2004 interview with the examiner. (*Id.* at ABTKEN00033401.)

206. The August 6, 2004 supplemental amendment included a chart in furtherance of Kennedy's argument that each of the pending claims in the '004 application was supported by the 1992 '248 application through intermediate patents and applications. (*Id.* at ABTKEN00033372–73.)

207. In response to the examiner's rejection under 35 U.S.C. § 103, Kennedy again argued that the claimed co-administration methods showed unexpected results, relying on the same clinical data as before. (*Id.* at ABTKEN00033378–83.)

208. Kennedy responded to the obviousness-type double patenting rejection based on the '766 patent by arguing that the rejection was moot as to the canceled claims and that with respect to the other claims, Kennedy intended to file a terminal disclaimer for the '766 patent. (*Id.* at ABTKEN00033383–84.)

209. On March 11, 2005, the examiner mailed an Office action rejecting all of the pending claims. (*Id.* at ABTKEN00033455–64.) Kennedy did not respond to this Office action, and the '004 application was abandoned. (*Id.* at ABTKEN00033475–76.)

### G. The '631 Application

210. On September 12, 2005, Kennedy filed U.S. Patent Application No. 11/225,-631 (the "'631 application"). The '631 application named Professors Maini and Feldmann as inventors. (Ex. 1420.1 at ABTKEN00001307–11.)

211. The original '631 application included 38 claims (*id.* at ABTKEN00001364–67), but a concurrently filed preliminary amendment canceled all the claims except for independent claim 1 (*id.* at ABTKEN00001386–89.) Claim 1 was directed to "[a] method for treating or preventing a tumor necrosis factor-mediated disease in an individual in need thereof comprising co-administering methotrexate and a TNFα antagonist to said individual,

in therapeutically effective amounts." (*Id.* at ABTKEN00001388.)

212. The original '631 application claimed benefit to the '248 application, filed October 8, 1992, through the same series of applications as the '775 and '004 applications. (*Id.* at ABTKEN00001387.)

213. Kennedy filed a second preliminary amendment on January 12, 2006, and revised the first paragraph of the specification, while still asserting the benefit of the October 8, 1992 date. (*Id.* at ABTKEN00001392–94.)

214. On January 18, 2007, Kennedy filed a third preliminary amendment, which canceled claim 1 (in addition to previously canceled claims 2 through 38), and added 33 new claims, which were all method claims. (*Id.* at ABTKEN00001414–27.)

215. The new claims began at claim 39, which was directed toward:

[a] method of treating an individual suffering from a human tumor necrosis factor-mediated disease comprising adjunctively administering with methotrexate an anti-human tumor necrosis factor-α antibody or a fragment thereof to the individual, wherein the anti-human tumor necrosis factor-α antibody or a fragment thereof (a) binds to an epitope on human tumor necrosis factor-α, (b) inhibits binding of human tumor necrosis factor-α to human tumor necrosis factor-α cell surface receptors and (c) is administered at a dosage of 0.01–100 mg/kg/day. (*Id.* at ABTKEN00001419.)

216. Similarly, claim 41 of the amended '631 application was directed toward:

[a] method for adjunctive treatment of an individual suffering from rheumatoid arthritis who is already being treated with methotrexate weekly comprising administering an anti-tumor necrosis factor-α antibody or a fragment thereof to the individual, wherein the anti-human tumor necrosis factor-α antibody or fragment thereof is administered to the individual multiple times, each such administration (i) being separated by an interval of weeks from the prior administration, and (ii) delivering 0.01–100 mg/kg/day of the anti-human tumor necrosis factor-α antibody or fragment thereof. (*Id.* at ABTKEN00001420.)

217. In response to a December 21, 2007 Office action requiring restriction of the claimed invention pursuant to 35 U.S.C. § 121 (*see id.* at ABTKEN00001430–35), on June 23, 2008, Kennedy filed an amendment, which, in part, amended the first paragraph of the specification setting forth the claimed priority to the '248 application and deleted the four oldest prior applications. As so amended, the '631 application claimed the benefit of the August 1, 1996 priority date of the '775 application instead of the October 8, 1992 priority date of the '248 application.[16] (*Id.* at ABTKEN00004539.)

218. On April 15, 2009, the examiner mailed an Office action, in which the examiner acknowledged the amended claim to a priority date and rejected or withdrew all the pending claims on various grounds, including under 35 U.S.C. § 103, and for obviousness-type double patenting over claims 1 through 14 of the '766 patent. (*Id.* at ABTKEN00006935–46.)

219. In explaining the rejection for obviousness-type double patenting, the examiner stated:

Although the conflicting claims are not identical, they are not patentably distinct from each other because the pat-

---

**16.** By asserting the August 1, 1996 priority date, Kennedy needed to overcome additional prior art, *see* 35 U.S.C. § 102(b), but also extended the expiration date of the invention claimed in the '631 application, *see id.* § 154. (*See also supra* n. 15.)

ented claims anticipate or render obvious the instant claimed methods, as the instant and patented claims are drawn to the same or nearly the same methods of treating arthritis with the anti-TNFα antibodies and methotrexate to meet the needs of the patient.

It is well settled that discovery of an optimum value of a result effective variable in a known process is ordinarily within the skill of the art....

As manipulating combination therapy was known and readily practiced by the ordinary artisan at the time the invention was made, it would have been obvious to optimize the dosing and dosing regimens of both the conventional methotrexate treatment as a disease modifying anti-rheumatic disease drug treatment (e.g., DMARDs) as well as the anti-TNFα antibodies in the treatment of rheumatoid arthritis. (*Id.* at ABTKEN00006945–46 (internal citations and quotations omitted).)

220. On August 5, 2009, the examiner held an interview with Professor Feldmann and Kennedy's representatives. (*Id.* at ABTKEN00007107.)

221. On September 15, 2009, Kennedy filed a response to the April 15, 2009 Office action, including amendments to the claims and remarks, and a summary of the interview held on August 5, 2009. (*Id.* at ABTKEN00007108–77.) In the interview summary, Kennedy stated that its proposed amendments to the claims were being made to

> make clear that the present invention involved the treatment of patients with active arthritis whose disease is incompletely controlled despite already receiving methotrexate by *adjunctively* administering with methotrexate therapy a different composition comprising an anti-human tumor necrosis factor α antibody or a fragment thereof to the indi-

vidual. (*Id.* at ABTKEN00007110 (emphasis added).)

222. In addition, Kennedy's summary of the interview recounted that, with respect to the obviousness-type double patenting rejection over the '766 patent, "Applicants noted that claims 1–14 of the ['766] patent ... are not directed to the same patient population as is claimed in the present application and are not directed to adjunctive therapy." Kennedy further recounted that "Applicants also noted that their claimed present invention provides unexpected results that demonstrate that the claimed invention is not obvious over claims 1–14 of the '766 Patent." (*Id.* at ABTKEN00007117.)

223. Kennedy responded to the rejections under 35 U.S.C. § 103 by arguing that the prior art combinations of methotrexate with other arthritis therapies did not provide the benefits obtained by adjunctively administering an anti-TNFα antibody to a patient already receiving methotrexate. Specifically, Kennedy stated that

> [a]s discussed above, *combination therapy includes numerous different types of associations such as simultaneous, sequential, separate, parallel, or intermittent administration of two or more therapeutic agents.* The choice of a TNF-antagonist in adjunctive therapy was not obvious over the cited references. *The advantages obtained using the claimed adjunctive therapy are NOT obtained with other types of combination.* (*Id.* at ABTKEN00007138 (emphasis added).)

224. Kennedy's statement that the "advantages obtained using the claimed adjunctive therapy are NOT obtained with other types of combination" is inconsistent with prior statements Kennedy made during the prosecution of the '766 patent,

where Kennedy asserted that the adjunctive therapy results in Examples 1, 2, and 3 of the specification were representative of broader co-administration of methotrexate and a TNFα antagonist to treat patients with rheumatoid arthritis (i.e., that the results of adjunctive treatment group were representative of what one would expect from co-administering methotrexate and anti-TNFα antibody generally). (Ex. 1419.1 at ABTKEN00001235–36; Tr. at 241:5–242:13; *see supra* ¶¶ 182, 183.)

225. In responding to the examiner's obviousness rejection, Kennedy also relied on the alleged unexpected results obtained by adjunctively administering anti-TNFα antibody to a patient population already receiving, but failing to respond to, methotrexate therapy. (Ex. 1420.1 at ABTKEN00007143–44; *see id.* at ABTKEN00001346–50.) In taking this position, Kennedy relied on the same data from the T–14 study as it had in the prosecution of the '766 patent. (*Compare id.* at ABTKEN00007143–44 (citing underlying data at page 35, lines 1 through 8, and Tables 3 and 4 of specification) *and –* 00001346–50 (containing underlying data at page 35, lines 1 through 8, and Tables 3 and 4 of specification), *with* Ex. 1419.1 at ABTKEN00001235–36 (citing, *inter alia,* same underlying data at page 48, lines 6 through 11, and Tables 3 and 4 of specification) *and* –00000126–31 (containing same underlying data at page 48, lines 6 through 11, and Tables 3 and 4 of specification); *see* Tr. at 155:10–20; *see also supra* ¶¶ 184, 185, 186.)

226. With regard to the examiner's obviousness-type double patenting rejection based on the '766 patent, Kennedy attempted to distinguish claims 1 through 14 of the '766 patent directed to co-administration from those in the pending application directed to adjunctive therapy. Specifically, Kennedy stated that

Applicants note that, in contrast to claims 1–14 of the '766 Patent, the individuals are already receiving methotrexate therapy in all of the pending claims. Additionally, the individuals still have active disease in the pending claims, despite having undergone methotrexate therapy. Claims 1–14 of the '766 Patent are generic with respect to these claim elements. For instance, the '766 Patent claims include individuals who did and who did not receive methotrexate. Likewise, they include individuals who are and who are not receiving benefit from methotrexate.

Applicants also note that the pending claims also differ from the '766 Patent claims in that the pending claims are directed to adjunctive therapy, a particular type of combination therapy. In contrast, the '766 Patent claims include adjunctive, sequential and simultaneous therapy.

Applicants further note that, in further contrast to the '766 Patent claims, the pending claims are limited to administration of anti-TNFα antibody in a separate composition from methotrexate. The '766 Patent claims include administration of anti-TNFα antibody and methotrexate in the same or separate compositions. (Ex. 1420.1 at ABTKEN00007151.)

227. Although Kennedy's September 15, 2009 filing stated that the pending claims covered only administration of the antibody and methotrexate in separate compositions while the '766 patent claims administration of the antibody and methotrexate in the same or separate compositions, it was well known by the August 1995 that methotrexate was more frequently administered in tablet form, while anti-TNFα antibody was administered via infusion (i.e., in separate compositions).

(*See* Tr. at 150:8–12, 167:15–168:13; *see also supra* ¶ 14.)

228. Kennedy also argued that the claimed invention was not obvious to try because "it is well known that methotrexate is toxic.... As the patients had already failed treatment with methotrexate, it would not be obvious to try to continue methotrexate therapy, given its known toxicity, while commencing anti-TNFα antibody therapy." (Ex. 1420.1 at ABTKEN00007151–52.) By August 1995, however, it was a well-established practice to continue treating with methotrexate rheumatoid arthritis patients who had not completely responded to such treatment (in order to prevent flares), while adding another therapeutic agent to the methotrexate treatment. (*See, e.g., supra* ¶¶ 16, 17, 18.)

229. To buttress the argument that the claimed invention was not obvious, Kennedy claimed there was no reasonable probability of success because "in patients who are not responding to methotrexate, there is no basis to expect them to respond to treatment with an anti-TNFα antibody administered adjunctively with methotrexate as opposed to anti-TNFα antibody monotherapy." (Ex. 1420.1 at ABTKEN00007153.) By August 1995, however, rheumatoid arthritis patients who had not responded completely to methotrexate alone were often treated with a second therapy in combination with continuing methotrexate treatment. (*See, e.g., supra* ¶¶ 16, 17, 18.)

230. Kennedy again claimed the unexpected results of "adjunctive" therapy over purported "sequential" therapy methods in arguing against the examiner's obviousness-type double patenting rejection. (Ex. 1420.1 at ABTKEN00007153–55.) As noted above (*see supra* ¶¶ 224, 225), however, the data Kennedy cited to support these alleged unexpected results were the same

data it had previously cited in support of its argument that the results of adjunctive therapy were representative of the results of co-administration generally. (*Compare* Ex. 1420.1 at ABTKEN00007154 (citing underlying data at page 35, lines 1 through 8, and Tables 3 and 4 of specification) *and* –00001346–50 (containing underlying data at page 35, lines 1 through 8, and Tables 3 and 4 of specification), *with* Ex. 1419.1 at ABTKEN00001235–36 (citing, *inter alia,* same underlying data at page 48, lines 6 through 11, and Tables 3 and 4 of specification) *and* –00000126–31 (containing same underlying data at page 48, lines 6 through 11, and Tables 3 and 4 of specification).) Furthermore, as Professor Maini testified at trial, these data did not support Kennedy's assertion of unexpected results because "sequential co-administration" was not a subject of the relevant research, which instead had focused on adjunctive therapy. (*See, e.g., supra* ¶ 186.)

231. In addition, Kennedy argued that the results from the claimed invention were unexpected because the "efficacy of the adjunctive therapy is clearly unrelated to any reduction in the development of an antiglobulin response to the anti-TNFα antibody in the patient, i.e. a HACA response, because the antibody is no longer present at therapeutic levels." (Ex. 1420.1 at ABTKEN00007154.) Kennedy stated that "it is again clear that a reduced HACA response cannot be the basis for the improvement in methotrexate therapy." (*Id.* at ABTKEN00007154–55.)

232. This assertion contradicts, *inter alia,* Kennedy's prior arguments to the PTO, Professor Maini and Feldmann's scientific articles, the '766 patent, and Professor Maini's testimony at trial, all of which identified reduction in immunogenicity (i.e., reduction in the HACA response) as one of the benefits of co-administration of anti-TNFα antibody and methotrexate.

(*See, e.g., supra* ¶¶ 84, 91, 92, 93, 116, 173 & n. 10.)

233. Furthermore, the studies and data that Kennedy cited as support for these alleged unexpected results (and which Kennedy cited in the prosecution of the '776 patent) did not compare adjunctive with co-administration therapy; these materials only included situations where patients received adjunctive anti-TNFα antibody therapy to continuing methotrexate treatment. As such, these materials provide no basis to conclude that adjunctive administration of an anti-TNFα antibody to methotrexate therapy provides unexpectedly better results compared to other forms of co-administration of methotrexate and an anti-TNFα antibody. (*See, e.g., supra* ¶¶ 146, 184, 186.)

234. On December 24, 2009, the PTO mailed a third Office action, in which the examiner responded to Kennedy's September 15, 2009 filing by withdrawing the previous grounds for rejection of the claimed invention in the '631 application. (Ex. 1420.1 at ABTKEN00008453, –00008456.)

235. The examiner rejected, however, the asserted claims under, *inter alia*, 35 U.S.C. §§ 102 and 103. (*Id.* at ABTKEN00008456–64.)

236. The examiner also maintained the obviousness-type double patenting rejection of the claims over claims 1 through 14 of the '766 patent, stating:

> Although the conflicting claims are not identical, they are not patentably distinct from each other because the patented claims anticipate or render obvious the instant claimed methods, as the instant and patented claims are drawn to the same or nearly the same methods of treating arthritis with the anti-TNFα

antibodies and methotrexate to meet the needs of the patient. (*Id.* at ABTKEN00008465.)

237. The examiner also stated that

> it would have been obvious to optimize the dosing and dosing regimens of both the conventional methotrexate treatment in the treatment of arthritis as well as the anti-TNFα antibodies in the treatment of diseases/conditions associated with arthritis. (*Id.*[17])

238. On May 7, 2010, Kennedy mailed a response amending certain claims, canceling certain claims, responding to the examiner's rejections, and summarizing a February 23, 2010 interview with the examiner. (*Id.* at ABTKEN00008474–8526, –00008761–64, –00008935–36.)

239. In its summary of the February 23, 2010 interview, Kennedy stated that the claimed invention of adjunctive therapy was "an unobvious species of claims 1–14 of the '766 Patent." (*Id.* at ABTKEN00008483.)

240. Kennedy's assertion contradicted its prior argument to the PTO, made during the prosecution of the '766 patent, that the adjunctive species was representative of the broader co-administration genus. (*See, e.g., supra* ¶¶ 182, 183.)

241. In responding to the examiner's rejection under 35 U.S.C. § 103, Kennedy repeated the argument it made in its prior response to the PTO and stated that "the advantages obtained by adjunctively administering with methotrexate therapy anti-human tumor necrosis factor-α antibodies are *not* obtained with other types of combination therapy." (Ex. 1420.1 at ABTKEN00008495.) This is also inconsistent with Kennedy's prior argument to the PTO during the prosecution of the '766

---

17. This language is almost identical to the examiner's reasons for the April 15, 2009 obviousness-type double patenting rejection. (*See supra* ¶ 219.)

patent, when—in order to get the examiner to allow broader claims 1 through 14 of the '766 patent related to the genus of co-administration—Kennedy asserted that adjunctive therapy was representative of combination therapy. (*See, e.g., supra* ¶¶ 182, 183; *see also* Ex. 1419.1 at ABTKEN00001235–36.)

242. Kennedy also stated that "Applicants discovered the unexpected result that patients who failed to respond to methotrexate therapy showed a remarkably high response rate when they were adjunctively administered methotrexate therapy with an anti-human tumor necrosis factor-α antibody therapy, even after disappearance of therapeutic levels of antibody." (Ex. 1420.1 at ABTKEN00008508 (emphasis omitted).) Once again, however, the studies and data on which Kennedy relied in making this assertion were the same as those Kennedy had cited in support of the asserted unexpected benefits of co-administration generally during the prosecution of the '766 patent. (*Compare id.* at ABTKEN00008508–09 (citing underlying data at page 35, lines 1 through 8, and Tables 3 and 4 of specification) *and* –00001346–50 (containing underlying data at page 35, lines 1 through 8, and Tables 3 and 4 of specification), *with* Ex. 1419.1 at ABTKEN00001235–36 (citing, *inter alia,* same underlying data at page 48, lines 6 through 11, and Tables 3 and 4 of specification) *and* –00000126–31 (containing same underlying data at page 48, lines 6 through 11, and Tables 3 and 4 of specification); *see also supra* ¶¶ 224, 225.)

243. Additionally, the studies and data that Kennedy cited both in support of the unexpected benefits of broader co-administration during the prosecution of the '766 patent, and in support of the unexpected benefits of adjunctive therapy during the prosecution of the '631 application, did not compare adjunctive therapy to any other kind of combination therapy. (*See, e.g., supra* ¶¶ 230, 233. *Compare* Ex. 1420.1 at ABTKEN00008508 ("As can be seen from the data shown in Tables 3 and 4, the response rates in patients receiving the adjunctive treatment of the invention compared to patients receiving methotrexate therapy, are significantly higher ....") *with* Ex. 1419.1 at ABTKEN00001235 ("Applicants further demonstrated the unexpected result that combination therapy with methotrexate and a TNFα antagonist produced high clinical response rates for significantly longer durations in comparison with that obtained with the treatment with each therapeutic modality separately." (citing Tables 3 and 4)).)

244. In its May 7, 2010 filing, Kennedy also responded to the examiner's rejection of the pending claims for obviousness-type double patenting over claims 1 through 14 of the '766 patent. Kennedy repeated its position that "the presently claimed invention is an unobvious species of claims 1–14 of the '766 Patent." Kennedy also stated that

[i]n contrast to claims 1–14 of the '766 Patent ... the pending claims provide a method of treating patients who are already receiving methotrexate therapy. Additionally, the pending claims provide a method of treatment for patients who still have active disease despite having undergone methotrexate therapy. Claims 1–14 of the '766 Patent are generic with respect to these claim elements. For instance, the '766 Patent claims include individuals who did and who did not receive methotrexate. Likewise, they include individuals who are and who are not receiving benefit from methotrexate. (Ex. 1420.1 at ABTKEN00008516.)

245. Kennedy further argued that

[t]he pending claims also differ from the '766 Patent claims in that the pending

claims are directed to adjunctive therapy, a particular type of combination therapy. In contrast, the '766 Patent claims include adjunctive, sequential and simultaneous therapy.

In further contrast to the '766 Patent claims, the pending claims are limited to administration of anti-human tumor necrosis factor-α antibody in a separate composition from methotrexate. The '766 Patent claims include administration of anti-human tumor necrosis factor-α antibody and methotrexate in the same or separate compositions. (*Id.* at ABTKEN00008517.)

246. Finally, in responding to the examiner's rejection of the claimed invention for obviousness-type double patenting, Kennedy again asserted that "the invention as claimed provides unexpected results that demonstrate that the claimed invention is not obvious over claims 1–14 of the '766 Patent." (*Id.*) Here too Kennedy's support for the alleged unexpected results for adjunctive therapy was the same data it cited during the prosecution of the '766 patent as supportive of the unexpected results of co-administration generally. These data were drawn from trials that only studied adjunctive therapy and did not make a comparison to any other type of combination therapy. (*See id.* at ABTKEN00008519–20; *see also supra* ¶¶ 225, 230, 233, 242, 243.)

247. On July 29, 2010, the examiner held an interview with Kennedy's attorneys and "invited applicant to provide a supplemental amendment to amend the claims for clarity in order to place this application in condition for allowance." (Ex. 1420.1 at ABTKEN00008962.) Kennedy filed a supplemental amendment amending certain claims on July 29, 2010. (*Id.* at ABTKEN00008947–53.)

248. On August 23, 2010, the PTO mailed to Kennedy a Notice of Allowability and a Notice of Allowance and Fee(s) Due. (*Id.* at ABTKEN00008956–64.) The Reasons for Allowance stated that the claims were allowed, in part, because of the "unexpected results" of "the claimed methods of treating rheumatoid arthritis by adjunctively administering methotrexate with anti-TNFα antibody in this patient population," and thus the claimed methods were "deemed to be an unobvious species." (*Id.* at ABTKEN00008963.)

249. On December 7, 2010, the PTO mailed an Issue Notification and issued the '442 from the '631 application. (*Id.* at ABTKEN00008980; *see* Ex. 2.)

### H. The '442 Patent and Specification

250. The '442 patent, entitled "Methods of Treating Rheumatoid Arthritis With An [sic] Anti–TNF–Alpha Antibodies and Methotrexate," lists Professors Maini and Feldmann as the inventors and The Mathilda and Terence Kennedy Institute of Rheumatology Trust as assignee. (Ex. 2.)

251. The '442 patent expires on August 21, 2018, which is twenty years from the effective filing date of August 1, 1996, plus an additional 750 days the PTO added under 35 U.S.C. § 154(b). (*Id.*)

252. Because the '442 patent derived from the '004 continuation application, which itself was a continuation application of the '775 application that subsequently issued as the '766 patent, the specification of the '442 patent is the same as that of the '766 patent. (*Compare* Ex. 1 *with* Ex. 2.)

### I. The Claims of the '442 Patent

253. Each of the 22 claims of the '442 patent is directed to a method of treating rheumatoid arthritis with anti-TNFα and methotrexate.

254. Claim 1, an independent claim, recites:

1. A method of treating an individual suffering from rheumatoid arthritis whose active disease is incompletely controlled despite already receiving methotrexate comprising adjunctively administering with methotrexate therapy a different composition comprising an anti-human tumor necrosis factor-α antibody or a human tumor necrosis factor-α binding fragment thereof to the individual, wherein the anti-human tumor necrosis factor-α antibody or fragment thereof (a) binds to an epitope on human tumor necrosis factor-α, (b) inhibits binding of human tumor necrosis factor-α to human tumor necrosis factor-α cell surface receptors and (c) is administered at a dosage of 0.01–100 mg/kg, and wherein such administration reduces or eliminates signs and symptoms associated with rheumatoid arthritis. (Ex. 2 at col. 35, lines 2–15.)

255. Claim 2, a dependent claim on claim 1, recites:

2. The method of claim 1, wherein (a) methotrexate is administered at an interval of a week or weeks, and (b) the anti-human tumor necrosis factor-α antibody or fragment thereof is administered multiple times, each such administration being separated by an interval of a week or weeks from the prior administration. (*Id.* at col. 35, lines 16–21.)

256. Claim 3, an independent claim, recites:

3. A method for adjunctive treatment of an individual suffering from rheumatoid arthritis who still has active disease despite prior therapy with methotrexate and who is already being treated with methotrexate comprising administering a different composition comprising an anti-human tumor necrosis factor-α antibody or a human tumor necrosis factor-α binding fragment thereof to the individual, wherein the anti-human tumor necrosis factor-α antibody or fragment thereof is administered to the individual multiple times, each such administration (i) being separated by an interval of a week or weeks from the prior administration, and (ii) delivering 0.01–100 mg/kg of the anti-human tumor necrosis factor-α antibody or fragment thereof and wherein such administration reduces or eliminates signs and symptoms associated with the rheumatoid arthritis. (*Id.* at col. 35, lines 22–36.)

257. Claim 4, a dependent claim on claim 3, recites:

4. The method of Claim 3, wherein the anti-human tumor necrosis factor-α antibody or fragment thereof (a) binds to an epitope on human tumor necrosis factor-α and (b) inhibits binding of human tumor necrosis factor α to human tumor necrosis factor-α cell surface receptors. (*Id.* at col. 35, lines 37–41.)

258. Claims 5, 6, 7, and 13 are dependent claims on claims 1 and 3, and recite:

5. The method of claim 1 or 3, wherein each administration of methotrexate delivers from 0.01–100 mg/kg.

6. The method of claim 1 or 3, wherein each administration of the antihuman tumor necrosis factor-α antibody or fragment thereof is separated by an interval of one day to thirty weeks from the prior administration.

7. The method of claim 1 or 3, wherein the anti-human tumor necrosis factor-α antibody or fragment thereof is an antibody.[18] (*Id.* at col. 35, lines 42–50.)

[...]

13. The method of claim 1 or 3, wherein the anti-human tumor necrosis factor-

---

18. Claim 20 of the '442 patent is a dependent claim on claim 7, and recites, "The method of claim 7, wherein the antibody is a monoclonal antibody." (Ex. at col. 36, lines 49–50.)

·α antibody or fragment is administered via infusion. (*Id.* at col. 36, lines 7–9.)

259. Claim 14, an independent claim, recites:

14. A method of treating an individual suffering from rheumatoid arthritis and already receiving methotrexate whose active disease is incompletely controlled comprising administering to the individual with methotrexate therapy a different composition comprising an anti-human tumor necrosis factor-α monoclonal antibody, wherein such administration reduces or eliminates signs and symptoms associated with the rheumatoid arthritis. (*Id.* at col. 36, lines 10–17.)

260. Claims 17 and 18, dependent claims on claim 14, recite:

17. The method of claim 14, wherein the anti-human tumor necrosis factor antibody is administered as adjunctive and/or concomitant therapy to methotrexate therapy.

18. The method of claim 14, wherein methotrexate is administered at an interval of a week or weeks and the anti-human tumor necrosis factor antibody is administered as multiple infusions. (*Id.* at col. 36, lines 31–37.)

261. Claim 19 is another independent claim, but expressly requires that the TNFα antibody be administered as adjunctive therapy to methotrexate:

19. A method of treating an individual suffering from active rheumatoid arthritis despite already receiving methotrexate comprising administering an anti-human tumor necrosis factor-α antibody to the individual, wherein the anti-human tumor necrosis factor-α antibody binds specifically to human tumor necrosis factor-α, and is administered in a different composition, in single or multiple doses, as adjunctive therapy to methotrexate therapy, wherein the metho-

trexate is administered in multiple doses and wherein such administration reduces or eliminates signs and symptoms associated with the arthritis. (*Id.* at col. 36, lines 38–48.)

## VII. THE INSTANT DISPUTE

### A. Humira

262. Humira, which is marketed by Abbott for the treatment a number of conditions, was the first commercially available fully human anti-TNFα antibody. (Tr. at 104:5–7, 148:10–16; Ex. 1546, Humira Prescribing Information (May 2012).)

263. In 2002, the FDA approved Humira for the treatment of rheumatoid arthritis either alone or in combination with methotrexate. (Ex. 1546 at 1, 4; Tr. at 107:11–13.)

264. Humira is currently also approved for use in treating juvenile idiopathic arthritis, psoriatic arthritis, ankylosing spondylitis, Crohn's disease, and plaque psoriasis, and Abbott has been studying its potential use for the treatment of other conditions. (Ex. 1546 at 4; Tr. at 104:14–106:7.)

265. As of the date of the trial in this matter, well over 500,000 patients were receiving treatment with Humira, and for the year 2011, sales revenue totaled over $3 billion. (Tr. at 106:10–18.)

### B. Abbott's Sublicenses to Kennedy's Patents

266. In 2002, while preparing for the launch of Humira, Abbott sought a license to Kennedy's '766 patent. (Tr. at 107:21–109:15.)

267. Although Kennedy owned the '766 patent rights, it had previously granted Centocor the right to sublicense the '766 patent (and related patents) to others. (*See supra* ¶ 34.) In 2002, Abbott and Centocor negotiated two separate license

agreements, which provided Abbott a license for the '766 patent family and a license from Abbott to Centocor for certain Abbott patents related to human anti-TNFα antibodies. (Tr. at 109:16–111:17; Ex. 20.)

268. Under the terms of this sublicense, Abbott pays Kennedy royalties on sales of Humira for use as co-administration with methotrexate. (Tr. at 112:9–113:11; Ex. 20.)

269. Based on this 2002 sublicense, Abbott has paid over $100 million in royalties to Kennedy for sales of Humira in the United States. (Tr. at 113:12–114:1.)

270. Since the '442 patent was issued in 2010, Kennedy has also demanded royalties for sales of Humira under the '442 patent as covered by the license. (*Id.* at 111:21–112:8, 115:8–13.)

271. Pursuant to the license, Abbott as licensee only owes Kennedy royalties for sales of Humira covered by a valid patent claim. (*Id.* at 115:16–116:1; Ex. 20.)

272. On April 13, 2011, Abbott filed this action for a declaratory judgment that certain claims of the '442 patent are invalid for obviousness-type double patenting over the '766 patent, and thus Abbott does not owe royalties to Kennedy under the '442 patent. (*See* Compl.)

### CONCLUSIONS OF LAW

### I. JURISDICTION

273. This action arises under the patent laws of the United States, 35 U.S.C. § 1 *et seq.*, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1338, and 2201. An actual controversy pursuant to 28 U.S.C. § 2201 exists between Abbott and Kennedy concerning the validity of claims 1 through 7, 13, 14, and 17 through 20 of Kennedy's '442 patent.

### II. OBVIOUSNESS–TYPE DOUBLE PATENTING

#### A. The Doctrine of Obviousness–Type Double Patenting

274. Under 35 U.S.C. § 101, an inventor may obtain "a patent," but only one patent for a single invention. *See Boehringer Ingelheim Int'l GmbH v. Barr Labs., Inc.,* 592 F.3d 1340, 1346 (Fed.Cir. 2010) (citations omitted). The doctrine of non-statutory, or "obviousness-type," double patenting prevents the extension of the term of a patent via the patenting of an obvious variation of the original patent. *Eli Lilly & Co. v. Teva Pharm. USA, Inc.,* 619 F.3d 1329, 1341–42 (Fed.Cir.2010) (citations omitted).

275. "Obviousness-type double patenting is a judicially-created doctrine designed to prevent claims in separate applications or patents that do not recite the same invention, but nonetheless claim inventions so alike that granting both exclusive rights would effectively extend the life of patent protection." *In re Hubbell,* 709 F.3d 1140, 1145 (Fed.Cir.2013) (quotations omitted). One of the aims of the doctrine is " 'to prevent unjustified timewise extension of the right to exclude granted by a patent[.]' " *Id.* (quoting *In re Van Ornum,* 686 F.2d 937, 943–44 (C.C.P.A. 1982)).

276. The doctrine of obviousness-type double patenting prohibits "claims in a second patent that are 'not patentably distinct from' " claims in an earlier patent. *Id.* (quoting *In re Longi,* 759 F.2d 887, 892 (Fed.Cir.1985)). Two claims are not "patentably distinct" if the later claim would have been obvious to a person of ordinary skill in the art based on the earlier claim, in light of the prior art.

*Amgen Inc. v. F. Hoffman–LA Roche Ltd.*, 580 F.3d 1340, 1361–62 (Fed.Cir.2009); *see In re Hubbell*, 709 F.3d at 1145 ("A later patent claim 'is not patentably distinct from an earlier claim if the later claim is obvious over, or anticipated by, the earlier claim.'" (quoting *Eli Lilly & Co. v. Barr Labs., Inc.*, 251 F.3d 955, 968 (Fed.Cir. 2001))).

277. Obviousness-type double patenting is a question of law premised on underlying findings of fact. *Otsuka Pharm. Co., Ltd. v. Sandoz, Inc.*, 678 F.3d 1280, 1290 (Fed.Cir.2012); *see Eli Lilly & Co. v. Teva Parenteral Medicines, Inc.*, 689 F.3d 1368, 1376 (Fed.Cir.2012).

278. The obviousness-type double patenting analysis involves two steps. First, the Court must construe the claims in the earlier patent and the claims in the later patent and determine the differences. Second, the Court must determine whether those differences render the claims patentably distinct. *Sun Pharm. Indust. v. Eli Lilly & Co.*, 611 F.3d 1381, 1384–85 (Fed.Cir.2010) (citing *Pfizer, Inc. v. Teva Pharm. USA, Inc.*, 518 F.3d 1353, 1363 (Fed.Cir.2008)); *see Eli Lilly*, 689 F.3d at 1377.

279. In determining whether the claims at issue are patentably distinct, the Court does not consider the differences in the claims in isolation, but must consider the claims "as a whole." *Eli Lilly*, 689 F.3d at 1377; *see Eli Lilly*, 251 F.3d at 972; *Gen. Foods Corp. v. Studiengesellschaft Kohle mbH*, 972 F.2d 1272, 1278 (Fed.Cir.1992).

280. The obviousness-type double patenting doctrine "is concerned with the improper extension of exclusive rights—rights conferred and defined by the *claims*." *Eli Lilly*, 689 F.3d at 1379. In undertaking the obviousness-type double patenting analysis, the Court must focus on what was claimed in the earlier patent, not what was disclosed. Accordingly, the Court may consider the specification of the earlier patent, but only to the extent necessary to construe its claims. *Id.* at 1378–79.

281. To reach an obviousness determination, the Court must conclude that a person of ordinary skill in the art would have perceived a reasonable expectation of success in making the later invention in light of the prior art. *Amgen*, 580 F.3d at 1362; *see Eli Lilly*, 689 F.3d at 1378; *Otsuka*, 678 F.3d at 1298.

282. Articles and other references published more than one year before the effective filing date of a patent are considered prior art. *See* 35 U.S.C. § 102(b); *e.g.*, *In re Crish*, 393 F.3d 1253, 1256 n. 6 (Fed.Cir. 2004).

283. Patents are presumed valid and each patent claim is independently presumed valid. 35 U.S.C. § 282(a). The party asserting invalidity of a patent or claim bears the burden. *Id.*; *see Microsoft Corp. v. i4i Ltd. P'ship.*, —— U.S. ——, 131 S.Ct. 2238, 2242, 180 L.Ed.2d 131 (2011).

284. A party seeking to invalidate a patent for obviousness-type double patenting must show facts supporting a conclusion of invalidity by clear and convincing evidence. *See Procter & Gamble Co. v. Teva Pharm. USA, Inc.*, 566 F.3d 989, 993–94, 999 (Fed.Cir.2009); *Amgen*, 580 F.3d at 1362.

### B. Claim Construction

285. Claim construction is matter of law. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 390–91, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996).

286. "It is a bedrock principle of patent law that that the claims of a patent

define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir.2005) (en banc) (quotations omitted); *see Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1373 (Fed.Cir. 2008) ("The words of the claims define the scope of the patented invention.").

287. The words of a patent claim are generally given their ordinary and customary meaning, i.e., the meaning that the term would have to a person of ordinary skill in the art at the time of the invention. *See Phillips*, 415 F.3d at 1312–13 (collecting cases). The time of the invention is the effective filing date of the patent application. *Id.* at 1313.

288. In addition, claim construction involves the consideration of the patent specification and its prosecution history, particularly when "the meaning of a claim term as understood by persons of skill in the art is ... not immediately apparent." *Id.* at 1313–14 (collecting cases); *see Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed.Cir.2005) ("We cannot look at the ordinary meaning of the term ... in a vacuum. Rather, we must look at the ordinary meaning in the context of the written description and the prosecution history." (quotations omitted)).

289. "The specification 'is always highly relevant to the claim construction analysis. Usually it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Phillips*, 415 F.3d at 1315 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed.Cir. 1996)).

[18] 290. However, "[w]hile claim terms are understood in light of the specification, a claim construction must not import limitations from the specification into the claims." *Deere & Co. v. Bush Hog, LLC*, 703 F.3d 1349, 1354 (Fed.Cir.2012).

291. Claim language and the specification generally carry greater weight than the prosecution history. *HTC Corp. v. IPCom GmbH & Co.*, 667 F.3d 1270, 1276 (Fed.Cir.2012). "[B]ecause the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Phillips*, 415 F.3d at 1317.

292. Yet the prosecution history is entitled to consideration as it "may 'demonstrate how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution.'" *AIA Eng'g Ltd. v. Magotteaux Int'l S/A*, 657 F.3d 1264, 1272 (Fed.Cir. 2011) (quoting *Phillips*, 415 F.3d at 1317).

293. It is also well settled that "prior art cited in a patent or cited in the prosecution history of the patent constitutes intrinsic evidence." *Powell v. Home Depot U.S.A., Inc.*, 663 F.3d 1221, 1231 (Fed.Cir.2011) (quotation omitted) (collecting cases).

294. In addition to this intrinsic evidence, extrinsic evidence such as inventor and expert testimony "may aid the court in coming to a correct conclusion as to the true meaning of the language employed in the patent." *AIA Eng'g*, 657 F.3d at 1273 (quotations omitted). Extrinsic evidence is generally considered "less reliable than the patent and its prosecution history in determining how to read claim terms." *Phillips*, 415 F.3d at 1318. The Court may rely, however, on such evidence "for a variety of purposes, such as to provide background on the technology at issue, to explain how an invention works, [or] to ensure that the [C]ourt's understanding of the technical aspects of the

patent is consistent with that of a person of skill in the art." *Id.; see Spansion, Inc. v. Int'l Trade Comm'n,* 629 F.3d 1331, 1344 (Fed.Cir.2010) ("While claim construction primarily relies on intrinsic evidence, extrinsic evidence, such as expert testimony, may also be used when given the appropriate weight by the trial court.").

### C. Patentably Distinct Claims

295. "[A] later claim that is not patentably distinct from, i.e., is obvious over or anticipated by, an earlier claim is invalid for obviousness-type double patenting." *Sun Pharm.,* 611 F.3d at 1385 (quotations omitted).

296. The obviousness analysis is generally the same under the double patenting doctrine and 35 U.S.C. § 103, with several distinctions. First, where statutory obviousness compares claimed subject matter to the prior art, obviousness-type double patenting compares claims in an earlier patent to claims in a later patent. In addition, obviousness-type double patenting does not require inquiry into objective criteria suggesting non-obviousness. *Procter & Gamble Co.,* 566 F.3d at 999 (citations omitted).[19] When it is offered, however, evidence of objective indicia of

non-obviousness, such as commercial success, long-felt need, or failure of others, should be considered by the Court in the obviousness-type double patenting analysis. *Eli Lilly,* 689 F.3d at 1381; *see Graham v. John Deere Co.,* 383 U.S. 1, 17–18, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966).

297. Under Federal Circuit precedent, "[i]t is well established that the disclosure of a genus in the prior art is not necessarily a disclosure of every species that is a member of that genus." *Atofina v. Great Lakes Chem. Corp.,* 441 F.3d 991, 999 (Fed.Cir.2006). Where a genus, however, "is so limited that a person of ordinary skill can 'at once envisage each member of this limited class,'" *In re Gleave,* 560 F.3d 1331, 1338 (Fed.Cir.2009) (quoting *Eli Lilly and Co. v. Zenith Goldline Pharm., Inc.,* 471 F.3d 1369, 1376 (Fed.Cir.2006)), "[i]n that limited circumstance, a reference describing the genus anticipates every species within the genus." *Id.* (citing *Perricone v. Medicis Pharm. Corp.,* 432 F.3d 1368, 1377 (Fed.Cir.2005)); *see Bristol–Myers Squibb Co. v. Ben Venue Labs., Inc.,* 246 F.3d 1368, 1380 (Fed.Cir.2001) ("[T]he disclosure of a small genus may anticipate the species of that genus even if the species are not themselves recited.").

---

**19.** In *Procter & Gamble,* the Federal Circuit further stated that the obviousness-type double patenting analysis "does not require inquiry into a motivation to modify the prior art." 566 F.3d at 999 (citing *Geneva Pharm., Inc. v. GlaxoSmithKline PLC,* 349 F.3d 1373, 1378 (Fed.Cir.2003)). However, in *Otsuka,* the Federal Circuit characterized this statement as "dictum," and held that "[i]n the context of claimed chemical compounds, an analysis of nonstatutory obviousness-type double patenting—like an analysis under § 103—entails determining, *inter alia,* whether one of ordinary skill in the art would have had reason or motivation to modify the earlier claimed compound to make the compound of the asserted claim with a reasonable expectation of success." 678 F.3d at 1297–98. Whether the

Federal Circuit's instruction to consider motivation to modify the prior art applies when the claimed inventions are methods of administrating two compounds—but not the compounds themselves—is ultimately immaterial because the Court finds such motivation existed here. (*See, e.g., infra* ¶¶ 355, 358, 369, 380, 387, 395, 403). *Cf. Eli Lilly,* 689 F.3d at 1378–81 (noting an exception to the general rule regarding the use of the specification in the obviousness-type double patenting analysis where an earlier patent claims a compound and discloses the utility of that compound in the specification, and a later patent claims a method of using that compound for particular use described in the earlier patent's specification) (citations omitted).

██ 298. "[A]nticipation does not require actual performance of suggestions in a disclosure. Rather, anticipation only requires that those suggestions be enabling to one of skill in the art." *Bristol–Myers Squibb*, 246 F.3d at 1379 (Fed.Cir.2001); *see Rasmusson v. SmithKline Beecham Corp.*, 413 F.3d 1318, 1326 (Fed.Cir.2005) (agreeing with litigant that *Bristol–Myers Squibb* "stands for the broader proposition that proof of efficacy is not required in order for a reference to be enabled for purposes of anticipation" under 35 U.S.C. § 102).

██ 299. In addition, the prior art need only indicate to a person of ordinary skill in the art "a reasonable expectation of success, not absolute predictability," for a subsequent invention to be obvious. *In re Longi*, 759 F.2d at 897; *see Amgen*, 580 F.3d at 1362.

## III. THE PERSON OF ORDINARY SKILL IN THE ART

██ 300. The Court may consider several factors in determining the level of ordinary skill in the art at the time of the invention, including: "(1) the educational level of the inventor; (2) type of problems encountered in the art; (3) prior art solutions to those problems; (4) rapidity with which innovations are made; (5) sophistication of the technology; and (6) educational level of active workers in the field." *Daiichi Sankyo Co. v. Apotex, Inc.*, 501 F.3d 1254, 1256 (Fed.Cir.2007) (quotations omitted); *see Amgen*, 580 F.3d at 1361–62 (noting that the determination of obviousness to a person of ordinary skill in the art is similar for obviousness-type double patenting and under 35 U.S.C. § 103).

301. As of August 1, 1996 (the effective filing date of the '442 patent), Professor Maini, one of the two primary inventors of the '766 and the '442 patents, was a practicing physician with advanced training and expertise in internal medicine and rheumatology, who had a rheumatology practice, and was actively conducting scientific research and clinical trials and publishing advanced papers on autoimmune diseases including rheumatoid arthritis. (Tr. at 447:13–453:9; Ex. HA). Professor Feldmann, the other primary inventor, was also a qualified physician, but worked primarily as a leading immunological researcher.[20] (Tr. at 453:10–25.)

302. These inventions address rheumatoid arthritis—a highly complex disease with severe health effects that can be life-threatening. (*Id.* at 151:19–23; *see supra* ¶¶ 3, 4.)

303. The existing medications and treatments for rheumatoid arthritis at the time were also very powerful and complicated, and as noted above, often were accompanied by serious side effects. (*Id.* at 151:23–24; *see supra* ¶¶ 6, 7, 13.)

304. Due to the complexity and severity of rheumatoid arthritis and its treatment, physicians treating patients with the disease (who would be prescribing the subject matter of the '766 and '442 patents to their patients) ideally should be rheumatologists, but must at least be practicing physicians with M.D. or D.O. degrees, with training and expertise in rheumatology,

---

**20.** Professors Maini and Feldmann's expertise and achievements are properly acknowledged. Their work and significant contributions to the study of, inter alia, rheumatoid arthritis were recognized by the Albert Lasker Award for Clinical Medical Research, the conferral of knighthood by Queen Elizabeth II, and their election to membership in the National Academy of Sciences. (Tr. at 448:23–449:16, 531:6–19; Ex. HA.) *Cf. Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 454 (Fed.Cir.1985) ("Inventors, as a class, ... possess something—call it what you will—which sets them apart from the workers of *ordinary* skill[.]").

and experience diagnosing, evaluating, and treating rheumatoid arthritis. (Tr. at 151:19–152:17, 589:3–590:11; *see also id.* at 379:1–24 (describing why primary care physicians without experience in rheumatology should preferably not treat rheumatoid arthritis patients).)

305. In light of these factors and the contemporary advances in the treatments of rheumatoid arthritis, the person of ordinary skill in the art as of the effective filing date of the '442 patent would be a practicing physician with an M.D. or D.O. degree and advanced training and expertise in rheumatology, who had experience in the diagnosis, evaluation, and treatment of rheumatoid arthritis, including an understanding of the mechanisms by which the various treatments at the time worked.[21]

## IV. THE SIMILARITIES AND DIFFERENCES BETWEEN THE CLAIMS OF THE '766 AND '442 PATENTS

### A. Construction of Claims 8 through 14 of the '766 Patent

#### 1) *"Co-administering"*

306. Claim 8 of the '766 patent is an independent claim on which claims 9 through 14 either directly or indirectly depend. Accordingly, each of these claims recites the method of treating rheumatoid arthritis set forth in claim 8 "comprising co-administering methotrexate and an anti-tumor necrosis factor alpha antibody or an antigen-binding fragment thereof[.]" (Ex. 1 at col. 35, lines 59–62.)

---

21. Although the Court finds that a person of ordinary skill in the art would have advanced training and expertise in the field of rheumatology, the Court agrees with Abbott's expert witness that even using Kennedy's proposed definition of a person of ordinary skill in the art, the Court's ultimate conclusion would be

307. "Co-administering" is not expressly defined in the '766 patent.

308. The '766 patent specification states that

[a]s a result of Applicants' invention, a method is provided herein for treating and/or preventing a TNF-mediated disease in an individual, comprising co-administering methotrexate and a tumor necrosis factor antagonist to the individual in therapeutically effective amounts. The TNF antagonist and methotrexate can be administered simultaneously or sequentially. (*Id.* at col. 4, lines 42–48.)

309. In addition, under the heading "Administration," the '766 patent specification states that

[t]he TNF antagonists and methotrexate can be administered prophylactically or therapeutically to an individual. TNF antagonists can be administered prior to, simultaneously with (in the same or different compositions) or sequentially with the administration of methotrexate. For example, TNF antagonists can be administered as adjunctive and/or concomitant therapy to methotrexate therapy. (*Id.* at col. 18, lines 56–62.)

310. These references to the administration of the TNF antagonist and methotrexate "sequentially" describe how the TNF antagonist and methotrexate need not be administered at the same time to effectuate co-administration, so long as the antibody is administered along with the continued administration of methotrexate. (Tr. at 225:21–226:15.)

311. Kennedy now argues that these references to "sequential" mean that the

---

the same. (Tr. at 152:13–17; *see also id.* at 589:20–592:1 (noting that while board certification in rheumatology would be ideal, approximately half of the physicians treating rheumatoid arthritis patients at the time did not have such certification).)

term "co-administration" as used in the '766 patent covers the situation where a patient taking a first drug switches to a different drug, while at the same time discontinuing the first drug, and argues that this was what occurred in the T–14 study/Example 1. (*See, e.g., id.* at 610:7–612:13; 724:3–731:8) This position, however, is contradicted by the language of the '766 patent, Kennedy's statements during the prosecution of the '766 patent, the publications by Professors Feldmann and Maini, and the testimony of the inventors.

312. The '766 patent specification describes the "present invention" as "based on the unexpected and dramatic discovery that a multiple dose regimen of a tumor necrosis factor antagonist, such as an anti-tumor necrosis factor antibody, when administered adjunctively with methotrexate to an individual suffering from a TNF-mediated disease produces a highly beneficial or synergistic clinical response for a significantly longer duration compared to that obtained with a single or multiple dose regimen of the ***antagonist administered alone*** or that obtained with ***methotrexate administered alone.***" (Ex. 1 at col. 2, lines 39–48 (emphasis added).)

313. Furthermore, the '766 patent identifies the group of patients in the T–14 study/Example 1 who were receiving methotrexate prior to receiving anti-TNFα antibody, ceased receiving methotrexate once they began receiving antibody, and only received antibody throughout the trial as having received anti-TNFα antibody "[w]ithout methotrexate." (*Id.* at col. 20, lines 40–42.)

314. The '766 patent specification describes Example 1 as "[a] randomized, double-blind, placebo controlled study . . . conducted to evaluate the safety and efficacy of a chimeric monoclonal anti-TNF antibody (cA2) following multiple infusions of 1, 3 or 10 mg/kg cA2, ***alone or in combination with methotrexate,*** compared to multiple infusions of placebo in combination with methotrexate, in the treatment of rheumatoid arthritis (RA) in patients." (*Id.* at col. 20, lines 43–49 (emphasis added).)

315. The treatment regimen referred to in the '766 patent as cA2 alone (or identified in the accompanying tables as "MTX-") was the treatment given to the patients who were taking methotrexate at entry to the T–14 trial, discontinued their methotrexate treatment prior to the initiation of the antibody treatment, and received only antibody treatment for the remainder of the trial. The '766 patent does not refer to this patient group as having received methotrexate and antibody "sequentially" or as "sequential co-administration." (Tr. at 228:18–231:2.)

316. Throughout the prosecution history of the '766 patent, Kennedy argued to the PTO (citing, *inter* alia, Example 1) that the unexpected results of the proposed invention were that "combination therapy with methotrexate and a multiple dose regimen of an anti-TNFα antibody produced markedly superior results than the results obtained with ***each agent alone.***" (Ex. 1419.1 at ABTKEN00000644 (emphasis added); *see supra* ¶¶ 156, 157, 158, 166, 173.)

317. In light of the language in the '766 patent itself and its prosecution history, a person of ordinary skill in the art would understand "co-administration" as used in claims 8 through 14 to encompass three possibilities for the order of administration of the methotrexate and anti-TNFα antibody (or fragment): (1) treatment with methotrexate and antibody is started at approximately the same time ("concomitantly"); (2) treatment with methotrexate is begun first and treatment with antibody is then added ("adjunctively") to ongoing and continuing methotrexate treatment;

or (3) treatment with antibody is begun first and treatment with methotrexate is then added ("adjunctively") to ongoing and continuing antibody treatment. (Tr. at 233:4–21, 237:17–243:12; *see also id.* at 522:20–523:8.)

318. A person of ordinary skill in the art would understand "co-administration" as used in the claims of the '766 patent did not encompass the discontinuing of methotrexate therapy and then initiating anti-TNFα antibody therapy alone. (*Id.* at 225:21–231:2)

319. This construction of "co-administration" is consistent with Professors Maini and Feldmann's description—in their published articles that appeared in peer-reviewed scientific journals—of the patients in the T–14 study (from which the data were drawn for Example 1 in the '766 patent) who had been receiving methotrexate, stopped receiving methotrexate, then received only antibody during the T–14 trial as having received antibody "monoth-erapy" (or antibody "alone" or antibody "without methotrexate"). (Ex. 1025 at 1553, 1560; *see supra* ¶¶ 94, 95, 96, 97; *see also* Ex. 1406, Raphaela Goldbach–Manky & Peter Lipsky, "New Concepts in the Treatment of Rheumatoid Arthritis," *Annu. Rev. Med.* 54:197, 208 (2003); Tr. at 733:6–734:10.)

320. This construction of "co-administration" is further corroborated by Professor Maini's testimony at trial, in which he testified that the study from which Kennedy drew the underlying data it relied upon in support of the '766 patent and its prosecution was not powered to study, and did not scientifically prove, the beneficial effects of "sequential" coadministration as that term is now used by Kennedy, but only studied and compared the administration of methotrexate or anti-TNF antibody alone with the administration of antibody as adjunctive therapy with ongoing methotrexate treatment.[22] (*See* Tr. at 523:9–525:16, 564:14–570:24; *supra* ¶¶ 185, 186.[23])

22. This is why, Professor Maini testified, he never referred to this group as having received "sequential" treatment. Professor Maini also testified that while the '766 patent referred to the patient group in Example 1 who entered the T–14 trial on methotrexate, stopped receiving methotrexate, then received only antibody throughout the trial as having received antibody monotherapy or antibody alone because "operationally, that's absolutely what we would do," one "could" refer to this group as receiving "sequential" treatment of methotrexate and antibody for the first few weeks of the antibody treatment because the carryover effect of the prior methotrexate treatment would still be present in the patients at this time. (Tr. at 518:8–521:15.) As noted above, however, Kennedy and the inventors never used this terminology in the materials upon which a person of ordinary skill in the art could rely in construing the terms of the '766 patent. (*See also id.* at 702:9–704:18.)

23. On cross-examination, Dr. Weinblatt testified that he considered the group of patients who were receiving methotrexate at entry to the trial, continued receiving methotrexate, and received antibody treatment in addition to their ongoing methotrexate treatment to be receiving "adjunctive" therapy even after the last infusion of antibody in the T–14 trial/Example 1 because, due to the long half-life of antibody, the clinical effects it produced extended beyond its final administration. Dr. Weinblatt (like Professor Maini and Dr. Lipsky) also testified that methotrexate can produce extended clinical effects after its final administration due to the cellular response to methotrexate treatment. Kennedy questioned Dr. Weinblatt's definitions because while he considered the patients experiencing extended clinical effects of antibody to be receiving adjunctive therapy after the administration of antibody ceased, he did not consider the patients who stopped receiving methotrexate and received antibody treatment throughout the study to be receiving "sequential" therapy at the beginning of the T–14 trial despite the extended clinical effects of methotrexate. (Tr. at 290:8–301:4.)

Regardless of whether the group who ceased receiving methotrexate at the beginning of the

321. Finally, this construction of "co-administration" is also consistent with Professors Maini and Feldmann's own personal descriptions of the T–14 study. (E.g., *supra* ¶¶ 98, 99, 100, 101, 102.) *See Bancorp Servs., L.L.C. v. Hartford Life Ins. Co.*, 359 F.3d 1367, 1375–76 (Fed.Cir.2004) (holding, in context of indefiniteness, that evidence of defendants' use of a term, although not publicly available at the time, may nonetheless be probative in claim construction to show a term's meaning).

### 2) "Individual in need thereof"

322. Claims 8 through 14 of the '766 patent (either independently or as a dependent claim) each recite a method of treating rheumatoid arthritis "in an individual in need thereof." (Ex. 1 at col. 35, line 59–col. 36, line 51.)

323. "An individual in need thereof" is not expressly defined in the '766 patent or otherwise expanded on within the patent.

324. The language in the '766 patent does not address whether the individuals in the patient population covered by claim 8 have mild or severe arthritis, or whether they had or had not previously been treated with methotrexate. (Tr. at 153:14–154:6.)

325. In light of the claim term's broad coverage, the Court will not import a limitation from the patent specification into the claim. *See Deere,* 703 F.3d at 1354; *Phillips,* 415 F.3d at 1323.

■ 326. In light of the language in the '766 patent claims, a person of ordinary skill in the art would understand "an individual in need thereof" as used in claims 8 through 14 to mean a patient with rheumatoid arthritis who requires treatment. (Tr. at 244:25–245:5.)

### 3) "Therapeutically effective amounts"

327. Claims 8 through 14 of the '766 patent (either independently or as a dependent claim) each recite a method of "co-administering methotrexate and an anti-tumor necrosis factor alpha antibody or an antigen-binding fragment thereof . . . in therapeutically effective amounts." (Ex. 1 at col. 35, line 59–col. 36, line 51.)

328. The specification of the '766 patent states that

> TNF antagonists and methotrexate are administered in therapeutically effective amounts; the compositions of the present invention are administered in a therapeutically effective amount. As used herein, a "therapeutically effective amount" is such that administration of TNF antagonist and methotrexate, or administration of a composition of the present invention, results in inhibition of the biological activity of TNF relative to the biological activity of TNF when therapeutically effective amounts of antagonist and methotrexate are not administered, or relative to the biological activity of TNF when a therapeutically effective amount of the composition is not administered. *A therapeutically effective amount is preferably an amount of TNF antagonist and methotrexate necessary to significantly reduce or eliminate signs and symptoms associated with a particular TNF-mediated disease.*
>
> (*Id.* at col. 19, lines 15–30 (emphasis added).)

antibody treatment and received only antibody throughout the study experienced extended clinical effects of methotrexate after its administration ceased, for the reasons stated above a person of ordinary skill in the art would not understand—contrary to the evidence that was available—this group to have received "sequential co-administration" as that term is used by Kennedy in this litigation.

329. This portion of the specification clarifies that a therapeutically effective amount is administered when the level of TNF activity in the body is reduced, even if there is not necessarily a reduction in the signs and symptoms of the TNF-mediated disease. (Tr. at 258:19–259:8.)

▮ 330. In light of the language of the '766 patent, and particularly in light of the explanation included in the patent specification, a person of ordinary skill in the art would understand the term "therapeutically effective amount" to encompass (but not be limited to) an amount necessary to reduce or eliminate signs and symptoms of rheumatoid arthritis. (*Id.* at 259:9–24.)

## B. Construction of Claims 1 through 7, 13, 14, and 17 through 20 of the '442 Patent

### 1) "Adjunctive administration"

331. Each of the independent claims 1, 3, 14, and 19 of the '442 patent are directed to a method of treating an individual suffering from rheumatoid arthritis. Claims 2, 4, 5, 6, 7, 13, 17, 18, and 20 are each dependent on at least one of the independent claims. (Ex. 2 at col. 35–36.)

332. Although each of these claims in the '442 patent uses slightly different wording, all are directed to "adjunctive" methods of treating rheumatoid arthritis in patients already receiving methotrexate therapy. (*Id.*)

333. For example, claim 1 recites, in relevant part:

A method of treating an individual suffering from rheumatoid arthritis whose active disease is incompletely controlled despite already receiving methotrexate comprising *adjunctively administering with methotrexate therapy a different composition comprising an anti-human tumor necrosis factor-α antibody or a human tumor necrosis factor-α binding fragment thereof .... (Id.* at col. 35, lines 2–8 (emphasis added); *see supra* ¶¶ 256, 259, 261 (claims 3, 14, and 19).)

334. The term "adjunctive" is not expressly defined in the Kennedy patents, but the claims and specification of the '442 patent make clear that adjunctive administration is one method of co-administration. (Tr. at 252:15–253:12.)

335. For example, the specification of the '442 patent notes that

[t]he present invention is based on the discovery that treatment of patients suffering from a TNF-mediated disease with a tumor necrosis factor antagonist, [s]uch as *an anti-tumor necrosis factor antibody, as adjunctive and/or concomitant therapy to methotrexate therapy* produces a rapid and sustained reduction in the clinical signs and symptoms of the disease. The present invention is also based on the unexpected and dramatic discovery that *a multiple dose regimen of a tumor necrosis factor antagonist, such as an anti-tumor necrosis factor antibody, when administered adjunctively with methotrexate* to an individual suffering from a TNF-mediated disease produces a highly beneficial or synergistic clinical response for a significantly longer duration *compared to that obtained with a single or multiple dose regimen of the antagonist administered alone or that obtained with methotrexate administered alone.* (Ex 2. at col. 2, lines 28–43 (emphasis added).)

336. The specification further explains the invention summarized above by stating:

As a result of Applicants' invention, a method is provided herein for treating and/or preventing a TNF-mediated dis-

ease in an individual, comprising *co-administering methotrexate and a tumor necrosis factor antagonist* to the individual in therapeutically effective amounts. *The TNF antagonist and methotrexate can be administered simultaneously or sequentially* (*Id.* at col. 4, lines 31–37 (emphasis added).)

337. In addition, the patent specification notes that

[t]he TNF antagonists and methotrexate can be administered prophylactically or therapeutically to an individual. *TNF antagonists can be administered prior to, simultaneously with* (in the same or different compositions) *or sequentially with the administration of methotrexate. For example, TNF antagonists can be administered as adjunctive and/or concomitant therapy to methotrexate therapy.* (*Id.* at col. 18; lines 40–46 (emphasis added).)

338. In light of the language of the '442 patent, and particularly the explanations included in the patent specification, a person of ordinary skill in the art would understand the term "adjunctive" therapy or treatment, as used in the '442 patent; to mean a method of administration of methotrexate and an anti-TNFα antibody in which therapy with an anti-TNFα antibody (of fragment thereof) is added to ongoing methotrexate treatment.

### 2) "Signs and symptoms" and "active disease"

339. Each of claims 1 through 7, 13, 14, and 17 through 20 of the '442 patent (either independently or as a dependent claim) recites that the method described above "reduces or eliminates signs and symptoms associated with rheumatoid arthritis." (*See id.* at col. 35–36.)

340. Each of these claims of the '442 patent (either independently or as a dependent claim) also identifies the patient population to be treated by the methods disclosed in the '442 patent as those with "active disease" or "active rheumatoid arthritis," despite having received methotrexate treatment. (*Id.*)

341. For example, claim 1 recites:

A method of treating an *individual suffering from rheumatoid arthritis whose active disease is incompletely controlled despite already receiving methotrexate* comprising adjunctively administering with methotrexate therapy a different composition comprising an anti-human tumor necrosis factor-α antibody or a human tumor necrosis factor-α binding fragment thereof.... (*Id.* at col. 35, lines 2–8 (emphasis added); see *supra* ¶¶ 256, 259, 261 (claims 3, 14, and 19).)

342. The specification of the '442 patent, in describing the studies that were recounted as Examples 1 and 2 in the patents, states that for each trial, "[a]ctive disease was defined by the presence of six or more swollen joints plus at least three of four secondary criteria." (Ex. 2 at col. 20, lines 34–39; *id.* at col. 31, lines 7–11.)

343. This definition of "active disease" is appropriate when used in the context of entry to clinical trials, but would not be used by a person of ordinary skill in the art in clinical practice treating patients with rheumatoid arthritis. Such person would, for example, consider a patient to have "active" rheumatoid arthritis if the patient experienced fatigue and joint pain, but not joint swelling. (Tr. at 245:19–249:12; *cf. id.* at 716:5–717:20 (noting that the only way the term "active disease" is used in the '442 patent is in the context of entry to clinical trials).)

344. As such, a person of ordinary skill in the art would not be limited to the definition of "active disease" used in the criteria for entry into the clinical trials

recounted in Examples 1 and 2, but would understand patients with "active disease" (or "active rheumatoid arthritis") to mean those patients with ongoing signs and symptoms of rheumatoid arthritis such as, *inter alia*, joint swelling and discomfort. (*Id.* at 245:7–18, 248:8–11.)

345. In light of the language of the '442 patent, a person of ordinary skill in the art would understand that patients with "active disease" or "active rheumatoid arthritis"—as those terms are used in the claims of the '442 patent—would be patients with continuing signs and symptoms of rheumatoid arthritis despite their ongoing methotrexate treatment.

346. This construction is consistent with the prior art and prevailing practices in the field at the time of the invention relating to the practice of continuing methotrexate treatment even if it did not completely eliminate a patient's rheumatoid arthritis. (*Id.* at 250:11–252:14, 253:13–255:6; Exs. FD, DB, FA, 78, 80, 1412, 73, 1408.1, 1575.)

## C. The Differences Between Claims 8 through 14 of the '766 Patent and Claims 1 and 2 of the '442 Patent

### 1) Methods of treatment and patient population

347. As noted above, claims 8 through 14 of the '766 patent broadly recite that methotrexate and an anti-TNFα antibody be co-administered, and there are only three ways of co-administering these two treatments: (1) beginning both treatments at the same time; (2) beginning methotrexate treatment first and adding anti-TNFα antibody as adjunctive treatment; or (3) beginning anti-TNFα treat-

ment first and adding methotrexate as adjunctive treatment. (*See supra* ¶¶ 111, 112, 113, 306, 317, 318.) Claims 1 and 2 of the '442 patent (independently and as a dependent claim, respectively) disclose the second of these three methods. (*See supra* ¶¶ 254, 255, 332, 334, 338; Tr. at 253:2–12.)

348. A person of ordinary skill in the art would not find there to be a substantial difference between co-administration as used in claims 8 through 14 of the '766 patent and adjunctive administration as used in claims 1 and 2 of the '442 patent. (Tr. at 252:15–253:12.)

349. In light of the limited universe of treatment methods within the genus of co-administration defined by claims 8 through 14 of the '766 patent, a person of ordinary skill in the art would have envisaged the species of adjunctive administration defined by claims 1 and 2 of the '442 patent. *See Gleave,* 560 F.3d at 1338; *Eli Lilly,* 471 F.3d at 1376.

350. In addition, of the three species within the genus of co-administration claimed in the '766 patent, the prior art as of August 1, 1995, would have "funneled" a person of ordinary skill in the art to the adjunctive treatment method claimed in the '442 patent. *Bayer Schering Pharma AG v. Barr Labs., Inc.,* 575 F.3d 1341, 1350 (Fed.Cir.2009).

351. For example, the July 1995 Higgins article teaches administering an anti-TNFα antibody adjunctively with methotrexate in patients with rheumatoid arthritis who did not respond to prior methotrexate treatment alone.[24] (Ex. 1575; *see supra* ¶¶ 79, 82.)

352. Furthermore, as of August 1, 1995, the patient population identified in

24. That the planned study referenced in the Higgins article never took place is of no moment. (*See* Tr. at 344:9–11.)

claims 1 and 2 of the '442 patent would have been the most likely to receive adjunctive anti-TNFα antibody therapy with their ongoing methotrexate therapy. While claims 8 through 14 of the '766 patent do not require previous methotrexate treatment in the patient to be treated (*see supra* ¶ 324), claims 1 and 2 of the '442 patent require that the patient to be treated with adjunctive anti-TNFα treatment still be experiencing signs and symptoms of rheumatoid arthritis despite ongoing methotrexate treatment (*see supra* ¶¶ 342, 345).

353. As of August 1995, methotrexate was considered the "gold standard" of treatments for rheumatoid arthritis (*see supra* ¶ 12); it was an established practice for rheumatologists to treat patients who did not respond completely to methotrexate treatment alone by adding another drug to the underlying methotrexate the patient was already receiving (*see supra* ¶¶ 16, 17); rheumatologists frequently continued such patients' methotrexate treatment and added another treatment to it, rather than stop methotrexate treatment, in order to prevent flares of symptoms (*see supra* ¶ 18); and FDA officials had publicly discussed clinical trials of adding new treatments (such as anti-TNFα antibodies) to ongoing methotrexate treatment in patients with continuing signs and symptoms of rheumatoid arthritis despite their methotrexate treatment (*see supra* ¶¶ 66, 67, 68, 69, 71, 72, 73).[25]

354. Also, a person of ordinary skill in the art would not consider there to be a substantial difference between the patient populations identified by claim 8 of the '766 patent and claim 1 of the '442 patent because patients whose active rheumatoid arthritis is incompletely controlled despite already receiving methotrexate would be included within the population of patients with rheumatoid arthritis "in need of treatment thereof." (Tr. at 249:13–250:20; *see supra* ¶¶ 326, 345.)

355. Accordingly, a person of ordinary skill in the art would have been motivated to try the adjunctive methods of treatment in claims 1 and 2 of the '442 patent with a reasonable expectation of success.

### 2) Different compositions

356. Claims 1 and 2 of the '442 patent (independently and as a dependent claim, respectively) recite that the methotrexate and anti-TNFα antibody be administered in different compositions. (*See supra* ¶¶ 254, 255.) Yet, a person of ordinary skill in the art would have known that, within the scope of claim 8 of the '766 patent, this was by far the most likely way to administer these two drugs in the treatment of rheumatoid arthritis.

357. Although as of August 1, 1995, methotrexate could be administered either as a tablet or an injection, at this time it was more commonly administered orally in tablet form, while the prior art on the use of anti-TNFα antibodies or fragments in the treatment of rheumatoid arthritis dis-

25. Kennedy's suggestion that the "placebo" patient group in Table 4 of the '442 patent, who only received 7.5 mg of methotrexate weekly throughout the T–14 trial, were nonresponders to methotrexate, and that it would have been contrary to clinical practice at the time to continue them on methotrexate and add another treatment, ignores the fact that the dosage level of methotrexate for these patients throughout the study was at the low end of what would have been prescribed at the time (*see supra* ¶ 14), and a person of ordinary skill in the art would not expect any patients who had active rheumatoid arthritis despite prior methotrexate treatment to respond to such a low level of treatment. In addition, clinical practice at the time would be to continue any partial responders to methotrexate on such treatment and to add another therapy as well (*see supra* ¶¶ 16, 18). (Tr. at 318:4–320:6.)

cussed the administration of antibody only via infusion, not in tablet form. (*See supra* ¶¶ 14, 43, 49, 58, 76, 84.)

358. As such, the specified use of different compositions in the methods of claims 1 and 2 of the '442 patent is not a meaningful distinction from the methods in claims 8 through 14 of the '766 patent, and a person of ordinary skill in the art would have been motivated to try the use of different compounds, as in claims 1 and 2 of the '442 patent, with a reasonable expectation of success. (Tr. at 255:7–19.)

*3) Characteristics of the tumor necrosis factor alpha mechanism*

359. Claim 1 of the '442 patent provides that the antibody or fragment must bind to an epitope on human TNFα.[26] (Ex. 2 at col. 35, lines 8–10.)

360. Claim 1 also provides that the antibody or fragment must inhibit binding of human TNFα to human TNFα cell surface receptors. (*Id.* at col. 35, lines 11–12.)

361. A person of ordinary skill in the art would expect these mechanisms of action by the antibody as they had been known in the prior art by August 1, 1995. (Tr. at 255:20–256:20; *e.g.,* Ex. 78; *see supra* ¶ 26.)

*4) Doses of antibody or fragment*

362. Claim 1 of the '442 patent also requires that the antibody (or fragment) be administered at a dose of 0.01–100 mg/kg. (Ex. 2 at col. 35, lines 12–15.) There is no specific dose recited in claim 8 of the '766 patent. (Tr. at 256:21–22.)

363. The 10,000–fold range of possible doses recited in claim 1 of the '442 patent

is extremely broad and encompasses the dose for each biologic agent that was studied and in the prior art as of August 1, 1995, all of which were between 0.1 mg/kg and 20 mg/kg. (*Id.* at 256:22–257:24; *see id.* at 745:22–746:15; Exs. 78, 79, 80, 1412; *supra* ¶¶ 43, 49, 58, 76.)

364. The Federal Circuit has recognized that when a patent claim includes ranges of elements, a prior art reference that falls within a claimed range may, like here, anticipate the claim. *See Atlas Powder Co. v. Ireco, Inc.,* 190 F.3d 1342, 1346 (Fed.Cir.1999) (citations omitted).[27]

*5) Efficacy*

365. Claim 8 of the '766 patent requires co-administering methotrexate and anti-TNFα antibody "in therapeutically effective amounts" (Ex. 1 at col. 35, lines 63–64), while claim 1 of the '442 patent recites that "administration [of the methotrexate and antibody] reduces or eliminates signs and symptoms associated with rheumatoid arthritis" (Ex. 2 at col. 35, lines 13–15).

364. A person of ordinary skill in the art would not consider this to be a meaningful distinction because the term "therapeutically effective amount" clearly encompasses an amount that "reduces or eliminates signs or symptoms associated with rheumatoid arthritis." (*See supra* ¶ 330.)

*6) Dosing intervals*

367. Claim 9 of the '766 patent defines a method of claim 8 wherein the anti-TNFα antibody or fragment is administered in dosages separated by days or weeks; it does not address the dosing interval for methotrexate. (*See supra*

---

26. The specification of the '442 patent defines epitope as "that portion of the antigen capable of being recognized by and bound by an antibody at one or more of the antibody's antigen binding region[s]," or, in other words, the portion of TNFα to which the

antibody binds. (Ex. 2 at col. 10, lines 30–33; *see* Tr. at 255:24–256:3.)

27. *See also Otsuka,* 678 F.3d at 1297 ("For anticipation, of course, motivation in the prior art is unimportant.").

¶ 113.) Claim 2 of the '442 patent provides that the methotrexate is administered at intervals of a week or weeks, and that the anti-TNFα antibody or fragment is administered multiple times separated by a week or weeks. (*See supra* ¶ 255.)

368. With regards to the dosing intervals for methotrexate, a person of ordinary skill in the art would not have considered the difference between these claims substantial because as of August 1, 1995, it was an established practice in the art that methotrexate should be given no more than once a week when treating a patient with rheumatoid arthritis. (Tr. at 260:10–25; *see supra* ¶ 14.) Knowing of this accepted dosing regimen for treating rheumatoid arthritis patients with methotrexate, a person of ordinary skill in the art would have been motivated to use it in a method of treatment as recited in claim 2 of the '442 patent with a reasonable expectation of success.

369. With regards to the dosing intervals for the anti-TNFα antibody or fragment, a person of ordinary skill in the art would not have considered the difference between these claims substantial because, as of August 1, 1995, it was known in the art that anti-TNFα antibody had been administered to rheumatoid arthritis patients (who had not completely responded to prior therapy with methotrexate) multiple times at intervals of a week or weeks to successfully reduce signs and symptoms associated with rheumatoid arthritis. (Tr. at 261:1–262:9; *see supra* ¶¶ 50, 51, 78.) Knowing of this successful dosing regimen for treating rheumatoid arthritis patients with anti-TNFα antibody, a person of ordinary skill in the art would have been motivated to use it in a method of treatment as

recited in claim 2 of the '442 patent with a reasonable expectation of success.

*7) "Unexpected Results" and Kennedy's Prior Statements to the Patent and Trademark Office*

370. Abbott argues that because during the successful prosecution of the '766 patent Kennedy argued to the PTO that the unexpected results shown in its trial data of adjunctive administration were representative of the results obtained by co-administration generally, Kennedy should now be estopped from arguing (as it did during the prosecution of the '442 patent, relying on the same underlying data) that the results of adjunctive administration were unexpected when compared to co-administration. *See Yeda Research and Dev. Co. v. Imclone Sys. Inc.*, 443 F.Supp.2d 570, 623–24 (S.D.N.Y.2006).[28]

371. While there is substantial evidence to support this position (*see, e.g., supra* ¶¶ 175–186, 223–225, 230–233, 239–243, 246), the Court need not decide this issue because, even considering Kennedy's arguments, the Court arrives at the same ultimate conclusions.

372. This is particularly so because Kennedy's arguments of unexpected results are contradicted by the data relied upon, the inventors' own words in their published articles and studies, the scientific record, and the inventors' own testimony. (*Id.*)

373. Furthermore, the additional unexpected results Kennedy alleges are not supported by the data. Kennedy argued that it was unexpected that patients who failed to respond to methotrexate therapy would show a remarkably high response rate when given adjunctive therapy (compared to those who received methotrexate

---

28. In considering this argument, the Court applies Second Circuit law, as the issue of judicial estoppel is not unique to patent cases.

*See U.S. Philips Corp. v. Sears Roebuck & Co.*, 55 F.3d 592, 596 n. 3 (Fed.Cir.1995) (collecting cases).

monotherapy or sequential therapy), even after the disappearance of therapeutic levels of antibody in their bodies. (Ex. 1420.1 at ABTKEN00007153–54.) But this comparison is flawed, first and foremost, because the "sequential therapy" mentioned was—in the study from which these data were drawn—merely the administration of antibody alone after the patients ceased receiving methotrexate. As discussed, the underlying studies and data evaluated this group as antibody "monotherapy" and did not compare different methods of co-administration.[29] (Tr. at 278:1–280:16; see, e.g., supra ¶¶ 186, 230.) Second, even assuming arguendo that the data supported a comparison of adjunctive administration to "sequential co-administration," the results would not have been unexpected because the adjunctive administration group was receiving two therapies that had been shown to reduce the signs and symptoms of rheumatoid arthritis, instead of just one. (Tr. at 280:17–25.) Third, the fact that patients who received adjunctive therapy showed positive residual effects of the treatment even after the level of antibody subsided would not be unexpected (particularly where the antibody treatment had an extended half-life). (Id. at 281:1–10.)

374. In addition, Kennedy's arguments rest on data that are selectively chosen and limited in scope because the studies and trials these data are drawn from were not powered to evaluate the results Kennedy claims (see id. at 281:11–282:24), and on positions that are directly contradicted by the inventors' own published works and statements regarding the data (see id. at 282:25–285:7; supra ¶¶ 231, 232).

### 8) Conclusions

375. Given the level of ordinary skill in the art as of August 1, 1995, the scope and content of the prior art, and the similarities and differences between claim 8 of the '766 patent and claim 1 of the '442 patent, there is clear and convincing evidence that the invention of claim 1 of the '442 patent as a whole would have been obvious to a person of ordinary skill in the art in view of claim 8 or any of claims 9 through 14 of the '766 patent. (See Tr. at 259:25–260:9.)

376. In addition, given the level of ordinary skill in the art as of August 1, 1995, the scope and content of the prior art, and the similarities and differences between claims 8 and 9 of the '766 patent and claim 2 of the '442 patent, there is clear and convincing evidence that the invention of claim 2 of the '442 patent as a whole would have been obvious to a person of ordinary skill in the art in view of claim 8 or 9 or any of claims 10 through 14 of the '766 patent. (See id. at 262:10–263:21.)

### D. The Differences Between Claims 8 through 14 of the '766 Patent and Claims 3 through 7, and 13 of the '442 Patent

#### 1) Dosing intervals

377. Claim 3 of the '442 patent provides for the same method of administration, patient population, form of administration, dose of anti-TNFα antibody, and efficacy of treatment as claim 1 of the '442 patent. (See supra ¶¶ 254, 256.) Accordingly, the Court's reasons for finding that these features of claim 1 of the '442 patent would have been obvious to a person of ordinary skill in the art in light of claims 8 through 14 of the '766 patent apply equally to the comparison of claim 3 of the '442

---

29. Indeed, the unexpected results Professor Maini and Dr. Lipsky testified to at trial were, at most, in comparison to methotrexate or antibody treatment alone, not adjunctive administration versus another method of co-administration. (See Tr. at 525:18–529:13, 771:22–774:12)

patent to claims 8 through 14 of the '766 patent. jr. at 263:22–265:13.)

378. Claim 3 of the '442 patent also requires that the anti-TNFα antibody or fragment be administered multiple times separated by an interval of a weeks or weeks from the prior administration. (*See supra* ¶ 256.) In addition, claim 6 of the '442 patent, which depends on either claim 1 or 3, provides that the anti-TNFα antibody or fragment be administered in intervals of one day to thirty weeks. (*See supra* ¶ 258.)

379. Again, claim 9 of the '766 patent required that the anti-TNFα antibody or fragment be administered in dosages separated by intervals of days or weeks. (*See supra* ¶ 113.)

380. As of August 1, 1995, a person of ordinary skill in the art would have known that anti-TNFα antibody had been administered to rheumatoid arthritis patients (who had not completely responded to prior therapy with methotrexate) multiple times at intervals of a week or weeks to successfully reduce signs and symptoms associated with rheumatoid arthritis. (*See supra* ¶ 369.) Knowing of this successful dosing interval for treating rheumatoid arthritis patients with anti-TNFα antibody, a person of ordinary skill in the art would have been motivated to use it in a method of treatment as recited in claims 3 and 6 of the '442 patent with a reasonable expectation of success.

381. Given the level of ordinary skill in the art as of August 1, 1995, the scope and content of the prior art, and the similarities and differences between claims 8 or 9 and 10 through 14 of the '766 patent and claims 3 and 6 of the '442 patent, there is clear and convincing evidence that the in-

ventions of claims 3 and 6 of the '442 patent as a whole would each have been obvious in view of claim 8 or 9 or any of claims 10 through 14 of the '766 patent.[30] (*See* Tr. at 265:14–266:3, 268:7–269:17.)

### 2) *Characteristics of the tumor necrosis factor alpha mechanism*

382. Claim 4 of the '442 patent is dependent on claim 3. Accordingly, the Court's reasons for finding that claims 1 and 3 of the '442 patent would have been obvious to a person of ordinary skill in the art in light of claims 8 through 14 of the '766 patent apply equally to the comparison of claim 4 of the '442 patent to claims 8 through 14 of the '766 patent. (Tr. at 266:4–15.)

383. The additional limitations in claim 4 regarding the characteristics of the anti-TNFα antibody or fragment (i.e., that it bind to an epitope on human TNFα and that it inhibit binding of human TNFα to human TNFα cell surface receptors (*see supra* ¶ 257)) also appear in claim 1 of the '442 patent (*see supra* ¶¶ 359, 360).

383. As such, for the reasons stated above with respect to claim 1, given the level of ordinary skill in the art as of August 1, 1995, the scope and content of the prior art, and the similarities and differences between claim 8 and any of claims 9 through 14 of the '766 patent and claim 4 of the '442 patent, there is clear and convincing evidence that the invention of claim 4 of the '442 patent as a whole would have been obvious to a person of ordinary skill in the art in view of claim 8 or any of claims 9 through 14 of the '766 patent. (*See* Tr. at 266:16–267:3.)

---

**30.** Because claim 6 of the '442 patent depends on claim 1 or 3, the Court's reasons for finding that claims 1 through 3 of the '442 patent would have been obvious to a person

of ordinary skill in the art in light of claims 8 through 14 of the '766 patent apply equally to the comparison of claim 6 of the '442 patent to claims 8 through 14 of the '766 patent.

### 3) Doses of methotrexate

385. Claim 5 of the '442 patent depends on claim 1 or 3. Accordingly, the Court's reasons for finding that claims 1 and 3 of the '442 patent would have been obvious to a person of ordinary skill in the art in light of claims 8 through 14 of the '766 patent apply equally to the comparison of claim 5 of the '442 patent to claims 8 through 14 of the '766 patent.

386. The additional limitation of claim 1 or 3 recited in claim 5 is that each administration of methotrexate deliver from 0.01 to 100 mg/kg of the drug. (See supra ¶ 258.)

387. This broad range of methotrexate dosing does not distinguish claim 5 from the prior art. As of August 1, 1995, one of ordinary skill in the art would have known that methotrexate was successfully administered to rheumatoid arthritis patients at weekly doses ranging from 7.5 to 25 mg per week, well within the range recited in claim 5. jr. at 267:4–21; see supra ¶ 14.) Knowing of this successful dosing range for treating rheumatoid arthritis patients with methotrexate, a person of ordinary skill in the art would have been motivated to use it in a method of treatment as recited in claim 5 of the '442 patent with a reasonable expectation of success.

388. Given the level of ordinary skill in the art as of August 1, 1995, the scope and content of the prior art, and the similarities and differences between claim 8 and any of claims 9 through 14 of the '766 patent and claim 5 of the '442 patent, there is clear and convincing evidence that claim 5 of the '442 patent would have been obvious in view of claim 8 or any of claims 9 through 14 of the '766 patent. (Tr. at 267:22–268:6.)

### 4) Use of antibody and not fragment

389. Claim 7 of the '442 patent depends on either claim 1 or 3. Accordingly, the Court's reasons for finding that claims 1 and 3 of the '442 patent would have been obvious to a person of ordinary skill in the art in light of claims 8 through 14 of the '766 patent apply equally to the comparison of claim 7 of the '442 patent to claims 8 through 14 of the '766 patent.

390. In contrast to claims 1 and 3 of the '442 patent, claim 7 does not include a fragment of an antibody that binds to TNFα; it only refers to the use of an antibody. (See supra ¶ 258.)

391. Since claim 8 of the '766 patent refers to both alternatives-the use of antibody or a fragment (see supra ¶ 111)-the use of only one of these choices in claim 7 of the '442 patent would have been obvious.

392. Given the level of ordinary skill in the art as of August 1, 1995, the scope and content of the prior art, and the similarities and differences between claim 8 and any of claims 9 through 14 of the '766 patent and claim 7 of the '442 patent, there is clear and convincing evidence that '442 patent claim 7 would have been obvious in view of claim 8 or any of claims 9 through 14 of the '766 patent. (Tr. at 269:18–271:7.)

### 5) Administration of tumor necrosis factor-α antibody

393. Claim 13 depends on claim 1 or 3. Accordingly, the Court's reasons for finding that claims 1 and 3 of the '442 patent would have been obvious to a person of ordinary skill in the art in light of claims 8 through 14 of the '766 patent apply equally to the comparison of claim 13 of the '442 patent to claims 8 through 14 of the '766 patent.

394. The only additional limitation of claim 13 is that the anti-TNFα antibody be administered via infusion. (See supra ¶ 258.)

395. Infusion as a method for administering biologics, including anti-TNFα antibody, was known in the art as of August 1, 1995, and had been used successfully to treat rheumatoid arthritis patients. (*See, e.g., supra* ¶¶ 43, 49, 58, 76, 78, 84.) Because infusion was used to administer antibody cA2 to individuals to treat rheumatoid arthritis as of August 1, 1995, a person of ordinary skill in the art would have been motivated to administer an anti-TNFα antibody by infusion as recited in claim 13 of the '442 patent with a reasonable expectation of success.

396. Given the level of ordinary skill in the art as of August 1, 1995, the scope and content of the prior art, and the similarities and differences between claim 8 and any of claims 9 through 14 of the '766 patent and claim 13 of the '442 patent, there is clear and convincing evidence that claim 13 of the '442 patent would have been obvious in view of claim 8 or any of claims 9 through 14 of the '766 patent. (Tr. at 271:8–272:5.)

E. **The Differences Between Claims 8 through 14 of the '766 Patent and Claims 14 and 17 through 20 of the '442 Patent**

1) *Methods of treatment and patient population*

397. Claim 14 of the '442 patent is an independent claim that, while not using the word "adjunctive," provides for the same method of administration (adding anti-TNFα antibody to ongoing methotrexate treatment), patient population, form of administration, and efficacy of treatment as claim 1 of the '442 patent. (*See supra* ¶ 259.) Accordingly, the Court's reasons for finding that these features of claim 1 of the '442 patent would have been obvious to a person of ordinary skill in the art in light of claims 8 through 14 of the '766 patent apply equally to the comparison of claim 14

of the '442 patent to claims 8 through 14 of the '766 patent. (Tr. at 272:6–13.)

398. Given the level of ordinary skill in the art as of August 1, 1995, the scope and content of the prior art, and the similarities and differences between claim 8 and any of claims 9 through 14 of the '766 patent and claim 14 of the '442 patent, there is clear and convincing evidence that claim 14 of the '442 patent would have been obvious in view of claim 8 or any of claims 9 through 14 of the '766 patent. (*Id.* at 272:15–273:2.)

399. Claim 17 of the '442 patent is dependent on claim 14. (*See supra* ¶ 260.) Accordingly, the Court's reasons for finding that claims 1 and 14 of the '442 patent would have been obvious to a person of ordinary skill in the art in light of claims 8 through 14 of the '766 patent apply equally to the comparison of claim 17 of the '442 patent to claims 8 through 14 of the '766 patent. (Tr. at 273:3–10.)

400. The additional limitation that claim 17 recites—administering anti-TNFα antibody either adjunctively and/or concomitantly—does not distinguish claim 17 of the '442 from claims 8 through 14 of the '766 patent, which require "co-administration" because, as noted above, co-administration includes adjunctive and/or concomitant therapy with methotrexate. (*See supra* ¶ 317.)

401. Given the level of ordinary skill in the art as of August 1, 1995, the scope and content of the prior art, and the similarities and differences between claim 8 and any of claims 9 through 14 of the '766 patent and claim 17 of the '442 patent, there is clear and convincing evidence that claim 17 of the '442 patent would have been obvious in view of claim 8 or any of claims 9 through 14 of the '766 patent. (Tr. at 273:11–24.)

### 2) Dosing intervals

402. Claim 18 of the '442 patent is dependent on claim 14. (*See supra* ¶ 260.) Accordingly, the Court's reasons for finding that claims 1 and 14 of the '442 patent would have been obvious to a person of ordinary skill in the art in light of claims 8 through 14 of the '766 patent apply equally to the comparison of claim 18 of the '442 patent to claims 8 through 14 of the '766 patent.

403. The additional limitations that claim 18 recites—that the methotrexate be administered at an interval of a week or weeks and the anti-TNFα antibody be administered as multiple infusions—do not distinguish claim 18 of the '442 patent from claims 8 through 14 of the '766 patent, because as of August 1, 1995, it was established in the art that the dosing regimen of methotrexate for rheumatoid arthritis patients was no more than once a week (*see supra* ¶ 14); it was known in the art that infusion was a method for administering therapeutic agents, including anti-TNFα antibody, to rheumatoid arthritis patients (*see supra* ¶¶ 43, 49, 58, 76, 84); and it was known in the art that multiple infusions of antibody had been used successfully to treat rheumatoid arthritis (*see supra* ¶¶ 50, 51, 78). (Tr. at 274:2–23.) Knowing of the accepted dosing regimen for treating rheumatoid arthritis patients with methotrexate, and of the successful administration of anti-TNFα antibody as multiple infusions, a person of ordinary skill in the art would have been motivated to use these techniques in a method of treatment as recited in claim 18 of the '442 patent with a reasonable expectation of success.

404. Given the level of ordinary skill in the art as of August 1, 1995, the scope and content of the prior art, and the similarities and differences between claim 8 and any of claims 9 through 14 of the '766 patent and claim 18 of the '442 patent, there is clear and convincing evidence that claim 18 of the '442 patent would have been obvious in view of claim 8 or any of claims 9 through 14 of the '766 patent. (Tr. at 274:24–275:11.)

### 3) Characteristics of the antibody

405. As with claim 14, claim 19 of the '442 patent is an independent claim that provides for the same method of adjunctive administration, patient population, form of administration, and efficacy of treatment as claim 1 of the '442 patent. (*See supra* ¶¶ 254, 261.) Accordingly, the Court's reasons for finding that these features of claim 1 of the '442 patent would have been obvious to a person of ordinary skill in the art in light of claims 8 through 14 of the '766 patent apply equally to the comparison of claim 19 of the '442 patent to claims 8 through 14 of the '766 patent. (Tr. at 275:12–276:1.)

406. The additional limitations that claim 19 recite do not distinguish claim 19 of the '442 from claims 8 through 14 of the '766 patent. First, the requirements for the mechanism by which the antibody would work were known in the art as of August 1, 1995. (*See supra* ¶ 361.) Claim 19 also requires that the antibody be administered in single or multiple doses while the methotrexate is administered in multiple doses. This does not distinguish claim 19 from claims 8 through 14 of the '766 patent because, again, as of August 1, 1995, it was known in the art that multiple administrations of antibody had been used to successfully treat rheumatoid arthritis (*see supra* ¶¶ 50, 51, 78), and it was an established practice in the art to administer methotrexate for several weeks when treating a rheumatoid arthritis patient with signs and symptoms of the disease (*see supra* ¶¶ 12, 14).

407. Given the level of ordinary skill in the art as of August 1, 1995, the scope and content of the prior art, and the similarities and differences between claim 8 and any of claims 9 through 14 of the '766 patent and claim 19 of the '442 patent, there is clear and convincing evidence that claim 19 of the '442 patent would have been obvious in view of claim 8 or any of claims 9 through 14 of the '766 patent. (Tr. at 276:3–16.)

408. Claim 20 of the '442 patent depends on claim 7, which itself depends on claims 1 or 3. Accordingly, the Court's reasons for finding that claims 1, 3, and 7 of the '442 patent would have been obvious to a person of ordinary skill in the art in light of claims 8 through 14 of the '766 patent apply equally to the comparison of claim 20 of the '442 patent to claims 8 through 14 of the '766 patent.

409. The additional limitation that claim 20 recites—that the antibody is a monoclonal antibody—does not distinguish claim 20 of the '442 patent from claims 8 through 14 of the '766 patent because as of August 1, 1995, it was known in the art that cA2, a monoclonal antibody to TNFα, had been successfully used to treat rheumatoid arthritis patients. (*Id.* at 276:17–277:11; *see supra* ¶¶ 26, 44, 51, 61, 75, 77, 78.)

410. Given the level of ordinary skill in the art as of August 1, 1995, the scope and content of the prior art, and the similarities and differences between claim 8 and any of claims 9 through 14 of the '766 patent and claim 20 of the '442 patent, there is clear and convincing evidence that claim 20 of the '442 patent would have been obvious in view of claim 8 or any of claims 9 through 14 of the '766 patent. (Tr. at 277:12–24.)

## CONCLUSION

For the foregoing reasons, the Court concludes that Abbott has proven by clear and convincing evidence that claims 1 through 7, 13, 14, and 17 through 20 of U.S. Patent No. 7,846,442 are invalid for obviousness-type double patenting over claims 8 through 14 of U.S. Patent No. 6,270,766, and that Kennedy has failed to prove its counterclaim for a declaratory judgment that these claims of the '442 patent are not invalid.[31] Abbott is directed to submit a proposed judgment in accordance with the above Findings of Fact and Conclusions of Law within ten (10) days.

SO ORDERED.

---

31. In its pretrial memorandum of law, Kennedy renews its motion that the obviousness-type double patenting doctrine does not apply here as a matter of law. (ECF No. 98.) This motion is denied for the reasons set forth in the Court's August 29, 2012 order. (ECF No. 80.) To the extent Kennedy renews its equitable argument, the Court denies this application as well. The evidence produced at trial and recounted above establishes—clearly and convincingly—that the claims at issue in the '442 patent would have been obvious to a person of ordinary skill in the art in light of the claims at issue in the '766 patent. The evidence also shows that Kennedy sought a 1992 priority date in order to avoid certain prior art and receive the protection of the '766 patent, then, after securing the '766 patent, sought to extend this protection beyond the expiration of the '766 patent by way of the indistinct '442 patent and its later expiration tied to an August 1, 1996 effective filing date. (*See, e.g., supra* nn. 14, 15, 16, and accompanying text; *see also* Tr. at 434:1–439:12; Ex. 1005 at 9; Ex. 1006 at 9; Ex. 1007 at 8.) The equities do not favor such an "unjustified timewise extension of the right to exclude granted by a patent." *In re Hubbell,* 709 F.3d at 1145 (quotations omitted)